Renée E. Rothauge (SBA 271239)
RRothauge@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
T: (415) 344-7000 / F: (415) 344-7050

Hari Santhanam (*pro hac vice*)
HSanthanam@perkinscoie.com
PERKINS COIE LLP
110 North Wacker Drive, Suite 3400
Chicago, Illinois 60606-1511
T: (312) 324-8400 / F: (312) 324-9400

John H. Gray (*pro hac vice*)
JHGray@perkinscoie.com
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
T: (602) 351-8000 / F: (602) 648-7000

Sarah E. Fowler (SBA 264838)
SFowler@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, California 94304-1212
T: (650) 838-4300 / F: (650) 838-4350

*Attorneys for Defendant Align Technology, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DENTAL MONITORING SAS, | Case No. 3:22-cv-7335-WHA |
| Plaintiff/ Counterclaim Defendant, | **DEFENDANT ALIGN TECHNOLOGY, INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | |
| ALIGN TECHNOLOGY, INC., | |
| Defendant/Counterclaim Plaintiff. | Judge:    Hon. William H. Alsup |

1    Defendant Align Technology, Inc. ("Defendant" or "Align") hereby answers the Complaint

2  of Plaintiff Dental Monitoring SAS ("Plaintiff" or "Dental Monitoring") concerning U.S. Patent

3  Nos. 10,755,409 ("the '409 patent"), 11,049,248 ("the '248 patent"), and 11,109,945 ("the '945

4  patent") (collectively, "the Asserted DM Patents").  Align denies that it infringes or has infringed

5  any valid, enforceable, and properly construed claim of the Asserted DM Patents, denies that there

6  is any basis for the suit brought by Dental Monitoring, denies that Dental Monitoring is entitled to

7  any relief, and denies all allegations not specifically admitted in this Answer.  Further, the Court

8  dismissed Plaintiff's claims for direct infringement under Section 271(g), indirect infringement

9  under Sections 271(b) and 271(c), and willful infringement under Section 284.    Dkt. 49.

10  Accordingly, any of Plaintiff's allegations related to those claims are not properly part of the case,

11  and no response should be required.  Out of an abundance of caution, however, Align provides

12  responses those paragraphs.  Align has endeavored to identify paragraphs that appear related to the

13  dismissed claims, but Align does not represent that this is a complete set of allegations that relate

14  to the dismissed claims.

15    Align additionally submits its counterclaims against Dental Monitoring seeking declaratory

16  judgments that the Asserted DM Patents are invalid and non-infringed.    Further, Align

17  counterclaims that Dental Monitoring infringes and/or has infringed, U.S. Patent Nos. 7,156,661

18  ("the '661 patent"), 10,945,813 ("the '813 patent"), 11,589,743 ("the '743 patent"), and 11,589,957

19  ("the '957 patent") (collectively, "the Asserted Align Patents").  A true and correct copy of the '661

20  patent is attached hereto as Exhibit 1, a true and correct copy of the '813 patent is attached hereto

21  as Exhibit 2, a true and correct copy of the '743 patent is attached hereto as Exhibit 3, and a true

22  and correct copy of the '957 patent is attached hereto as Exhibit 4.

23                                **NATURE OF ACTION**

24    1.    Align admits that Plaintiff purports to bring a civil action for infringement of the

25  Dental Monitoring Asserted Patents arising under the Patent Laws of the United States, 35 U.S.C.

26  § 1, et seq.  Align denies that it infringes or has infringed any valid, enforceable, and properly

27  construed claim of the Asserted DM Patents and denies that Plaintiff is entitled to any relief for

28  such alleged infringement.  Align denies any remaining allegations in paragraph 1.

2.      Align admits that Dental Monitoring seeks judgment that Align has allegedly infringed and continues to infringe the Asserted DM Patents.  Align denies that it has infringed or continues to infringe any valid, enforceable, and properly construed claim of the Asserted DM Patents.  Align denies any remaining allegations in paragraph 2.

## PARTIES

3.      Align admits that Plaintiff purports to be a corporation organized and existing under the laws of France with its principal place of business at 75 Rue de Tocqueville, 75017, Paris, France.  To the extent this paragraph contains additional allegations, Align is without knowledge sufficient to form a belief as to the truth of those allegations and on that basis denies them.

4.      Admitted.

## JURISDICTION AND VENUE

5.      Align admits that Plaintiff purports to bring a civil action for infringement of the Dental Monitoring Asserted Patents arising under the Patent Laws of the United States, 35 U.S.C. § 1, et seq., including 35 U.S.C. 271, for infringement of the Asserted DM Patents.  Align denies that it infringes, or has infringed, any valid, enforceable, and properly construed claim of the Asserted DM Patents.  Align denies any remaining allegations in paragraph 5.

6.      Align admits that this Court has subject matter jurisdiction for purposes of this action only.

7.      Align admits that it is a corporation organized and existing under the laws of the State of Delaware, with its west coast headquarters in San Jose, California.  Align denies that acts of infringement by Align have occurred within this district or elsewhere.  Align admits that this Court has personal jurisdiction over Align for purposed of this action only.  Align denies any remaining allegations in paragraph 7.

8.      Align admits that venue is proper in this judicial district for purposes of this action only.  Align denies that acts of infringement by Align have occurred within this district or elsewhere.  Align is without knowledge sufficient to form a belief as to the truth of any remaining allegations set forth in paragraph 8 and on that basis denies them.

# FACTUAL BACKGROUND

### A.    Dental Monitoring's Allegedly Pioneering Technologies[1]

9.    Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 9 and on that basis denies them.

10.    Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 10 and on that basis denies them.

11.    Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11 and on that basis denies them.

12.    Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12 and on that basis denies them.

13.    Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 and on that basis denies them.

14.    Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14 and on that basis denies them.

### B.    The Dental Monitoring Asserted Patents

15.    This allegation relates to a dismissed claim and is therefore not part of the current case, so no response from Align is required.  To the extent a response is required, however, Align admits that Dental Monitoring purports to own the Asserted DM Patents.  Align is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 15 and on that basis denies them.  *See also* Order re Motion to Dismiss, Dkt. 49 (granting motion to dismiss regarding indirect and willful infringement because, *inter alia*, DM failed to "show Align knew of these three specific patents and their [alleged] infringement").

16.    Align admits that a copy of the '409 patent is attached as Exhibit A to the Complaint, that the '409 patent is entitled "Method for Analyzing an Image of a Dental Arch," that the '409 patent names Philippe Salah, Thomas Pellissard, Guillaume Ghyselinck, and Laurent Debraux as

---

1 Align has generally incorporated the headings that appear in Plaintiff's Complaint to facilitate the Court's comparison of the allegations in the Complaint and Align's responses.  Align does not necessarily agree with the characterization in such headings and does not waive the right to object to such characterizations or their implications.

inventors, and that it issued on August 25, 2020. Align denies that the '409 patent was duly and legally issued. Align denies any remaining allegations in paragraph 16.

17.    Paragraph 17 contains conclusions of law to which no response is required. To the extent a response is required, Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17 and on that basis denies them.

18.    Align admits that a copy of the '248 patent is attached as Exhibit B to the Complaint, that the '248 patent is entitled "Method for Analyzing an Image of a Dental Arch," that the '248 patent names Philippe Salah, Thomas Pellissard, Guillaume Ghyselinck, and Laurent Debraux as inventors, and that it issued on June 29, 2021. Align denies that the '248 patent was duly and legally issued. Align denies any remaining allegations in paragraph 18.

19.    Paragraph 19 contains conclusions of law to which no response is required. To the extent a response is required, Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 19 and on that basis denies them.

20.    Align admits that a copy of the '945 patent is attached as Exhibit C to the Complaint, that the '945 patent is entitled "Method of Evaluating an Orthodontic Aligner," that the '945 patent names Philippe Salah, Thomas Pellissard, Guillaume Ghyselinck, and Laurent Debraux as inventors, and that it issued on September 7, 2021. Align denies that the '945 patent was duly and legally issued. Align denies any remaining allegations in paragraph 20.

21.    Paragraph 21 contains conclusions of law to which no response is required. To the extent a response is required, Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21 and on that basis denies them.

22.    Align admits that the claims of the '409 and '248 patents relate to methods for "sending an information message ... to guide [an] operator … to acquire a new analysis image" and "assessing the shape of an orthodontic aligner," respectively. Align admits that the '409 patent specification includes the quoted text. Align denies any remaining allegations in paragraph 22.

23.    Align admits that the '409 patent specification includes the quoted text. Align denies any remaining allegations in paragraph 23.

24.     Align admits that the '409 patent specification includes the quoted text.  Align denies any remaining allegations in paragraph 24.

25.     Align admits that the claims of the '945 patent relate to a method for "evaluating the shape of an orthodontic aligner worn by a patient" and that the '945 patent specification includes the quoted text.  Align denies any remaining allegations in paragraph 25.

**C.     Align's Alleged Late Reaction and Efforts to Catch Up**

26.     Align is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26 and on that basis denies them.

27.     Denied.

28.     This allegation relates to a dismissed claim and is therefore not part of the current case, so no response from Align is required.  To the extent a response is required, however, Align admits that representatives of Align have previously met with representatives of Dental Monitoring.  Align denies all remaining allegations in paragraph 28.  *See also* Order re Motion to Dismiss, Dkt. 49 (granting motion to dismiss regarding willful infringement under Section 284).

**D.     Align's Allegedly Infringing Products and Services**

29.     Denied.

30.     Align admits that the website https://www.aligntech.com/solutions includes the text quoted in paragraph 30.  Align also admits that the website https://www.invisalign.com/invisalign-digital-experience states that "a 3D image of…teeth" is created.  To the extent there are any remaining allegations in paragraph 30, Align denies them.

31.     Align admits that the website listed in paragraph 31 includes the text quoted in paragraph 31.  To the extent there are any remaining allegations in paragraph 31, Align denies them.

32.     Align admits that the website https://www.invisalign.com/provider/treatment-solutions/invisalign-treatment states that Invisalign allows for "[p]lan[ning] the treatment on your own terms - anytime, anywhere" and that an exemplary "[n]umber [o]f [a]ligners" and "[t]ypical [t]reatment [t]ime" can vary.  To the extent there are any remaining allegations in paragraph 32, Align denies them.

33.    Align admits that the website listed in paragraph 33 includes the text quoted in paragraph 33.  To the extent there are any remaining allegations in paragraph 33, Align denies them.

34.    Align admits that the website listed in paragraph 33 includes the text quoted in paragraph 34.  To the extent there are any remaining allegations in paragraph 34, Align denies them.

35.    Align admits that the website listed in paragraph 33 includes the text quoted in paragraph 35.  To the extent there are any remaining allegations in paragraph 35, Align denies them.

36.    Align admits that a patient may choose to download an optional app on the patient's phone or similar device ("Optional Align App") as an optional add-on feature for using the Invisalign Virtual Care AI platform, and that the Optional Align App can "help Invisalign doctors connect with patients remotely…to monitor treatment progress."  *See,* *e.g.,* https://investor.aligntech.com/news-releases/news-release-details/align-technologys-next-generation-invisalign-virtual-care-ai, a true and correct copy of which is attached hereto as Exhibit 5.  Align denies that a patient is required to download said app on the patient's phone or similar device.  Align denies any remaining allegations in paragraph 36.

37.    Align admits that a patient may choose to download the Optional Align App as an add-on feature for using what Dental Monitoring refers to as the Invisalign Virtual Care AI platform.  Align denies that the patient is required to download the Optional Align App as an initial step.  To the extent there are any remaining allegations in paragraph 37, Align denies them.

38.    Align admits that the website listed in paragraph 38 indicates that a patient can use the Optional Align App to "take…photos" with "cheek retractors on" or "cheek retractors off," and that the patient "may use two spoons as a temporary alternative until [the patient] can access cheek retractors."  To the extent there are any remaining allegations in paragraph 38, Align denies them.

39.    Align admits that the website listed in paragraph 39 indicates that a patient may use the Optional Align App to "take…photos" of "aligners…with a slightly open bite," "aligners off…biting down completely," and "a smiling photo with aligners."  Align denies that the Optional

Align App and/or patient "must capture various images of the patient's teeth with the aligner on and off, with their bite open or closed, and in certain positions." To the extent there are any remaining allegations in paragraph 39, Align denies them.

40.     Align admits that the video listed in paragraph 40 indicates that the Optional Align App displays the text "come a bit closer" or "move back a bit" when photos are taken. To the extent there are any remaining allegations in paragraph 40, Align denies them.

41.     Align admits that the video listed in paragraph 41 indicates that a patient can use the Optional Align App to select the option to "[s]end to doctor" to "submit…photos." Align admits that the website listed in paragraph 41 indicates that a patient can choose to use the Optional Align App to "submit…photos" to a doctor. To the extent there are any remaining allegations in paragraph 41, Align denies them.

42.     Align admits that the website listed in paragraph 42 states that what Dental Monitoring refers to as "the Invisalign Virtual Care AI platform" can be used for assessments indicating feedback, as described below, that are "routed to trained personnel to review and either accept or reject the assessment." Align admits that the website further states that the Invisalign Virtual Care AI platform can use "Doctor's notification settings to provide…two types of feedback" that show, for example, "On track," which "indicates that [the patient's] new smile is progressing according to [their] custom treatment plan" and that the patient should "[c]ontinue wearing [their] aligners as directed," or "Instructions," which "indicates that [the patient's] Doctor or Virtual Care 3.0 (based on [the] Doctor's settings) has provided [the patient] additional guidance." Align denies any remaining allegations in paragraph 42.

43.     Align admits that neural network or deep learning devices can involve training based on a set of images. Align denies any remaining allegations in paragraph 43.

## CLAIMS FOR PATENT INFRINGEMENT

44.     This paragraph does not contain any factual allegations requiring a response. To the extent a response is necessary, Align denies any allegations in paragraph 44.

1

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,755,409

2

45.     This paragraph does not contain any factual allegations requiring a response.  To the

3

extent a response is necessary, Align incorporates by reference paragraphs 1-44 of Align's Answer.

4

46.     Denied.

5

47.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

6

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

7

48.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

8

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

9

49.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

10

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

11

50.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

12

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

13

51.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

14

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

15

52.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

16

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

17

53.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

18

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

19

54.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

20

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

21

55.     Denied.

22

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 11,049,248

23

56.     This paragraph does not contain any factual allegations requiring a response.  To the

24

extent a response is necessary, Align incorporates by reference paragraphs 1-55 of Align's Answer.

25

57.     Denied.

26

58.     Denied.  Align objects to this paragraph as improper to the extent that it purports to

27

allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

28

59.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

60.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

61.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

62.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

63.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

64.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

65.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

66.    Denied.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 11,109,945

67.    This paragraph does not contain any factual allegations requiring a response.  To the extent a response is necessary, Align incorporates by reference paragraphs 1-66 of Align's Answer.

68.    Denied.

69.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

70.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

71.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

72.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

73.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

74.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

75.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

76.    Denied.  Align objects to this paragraph as improper to the extent that it purports to allege claims that have been dismissed in light of the Court's June 30, 2023 Order (Dkt. 49).

77.    Denied.

**JURY DEMAND**

78.    This paragraph does not contain any factual allegations requiring a response.

**ANSWER TO PRAYER FOR RELIEF**

This paragraph and subparagraphs "(a)" through "(l)" of the Complaint constitute a prayer for relief to which no response is required.  To the extent there are any allegations of factual or legal entitlement to the relief requested, Align denies such allegations.  Align denies that Plaintiff is entitled to any relief whatsoever in this action, including but not limited to the requested relief. Align further denies each and every allegation of Plaintiff's Complaint as set forth herein or to which Align has not responded.

**AFFIRMATIVE DEFENSES**

Pursuant to 35 U.S.C. § 282(b), Align asserts the following defenses to Plaintiff's Complaint, without assuming any burden of proof or persuasion on any issue, whether in whole or in part, where such burden(s) would otherwise be borne by Plaintiff.  Align reserves all defenses under Federal Rule of Civil Procedure 8(c) and the Patent Laws of the United States, and any other defense available at law or in equity that may now exist or may become available, including defenses that become apparent during Align's ongoing investigation and discovery in this matter.

**FIRST DEFENSE**

**(Failure to State a Claim)**

1.      Plaintiff's Complaint fails to state a claim upon which relief may be granted.

**SECOND DEFENSE**

**(Noninfringement of U.S. Patent No. 10,755,409)**

2.      Align has not infringed, and does not infringe, any valid, enforceable, and properly construed claim of the '409 patent.

**THIRD DEFENSE**

**(Noninfringement of U.S. Patent No. 11,049,248)**

3.      Align has not infringed, and does not infringe, any valid, enforceable, and properly construed claim of the '248 patent.

**FOURTH DEFENSE**

**(Noninfringement of U.S. Patent No. 11,109,945)**

4.      Align has not infringed, and does not infringe, any valid, enforceable, and properly construed claim of the '945 patent.

**FIFTH DEFENSE**

**(Invalidity of U.S. Patent No. 10,755,409)**

5.      The claims of the '409 patent are invalid for failure to satisfy one or more of the conditions for patentability set forth in Title 35 of the United States Code, including but not limited to Sections 101, 102, 103, and 112 and the doctrine of obviousness-type double patenting.

6.      For example, and without limitation, the claims of the '409 patent are invalid for lack of subject-matter eligibility under 35 U.S.C. § 101.

7.      The claimed methods of the '409 patent relate to the abstract idea of collecting, analyzing, and presenting information to guide a camera operator to take a picture of teeth. (*E.g.*, '409 patent at claim 1.)  As the '409 patent acknowledges, in conventional orthodontic assessments, patients would capture images of their dental arch and transmit the images to an orthodontist for assessment.  (*Id.* at 1:11-15.)

8.    International Application No. PCT/EP2015/074896, published as WO 2016/066651A1 ("WO '651"), which is admitted prior art to the '409 patent, further describes known methods whereby patients would use an "image acquisition apparatus" such as a "mobile phone" (or other camera-enabled device) to acquire images of their dental arch (WO '651 at 23:27-32, 24:15-20, 45:21-25), and the images would be processed and analyzed to "track the evolution of orthodontic treatment (*id*. at 1:2-3, 44:19-23). WO '651 even explains that as part of this process, the image acquisition apparatus may guide the patient in acquiring the images by providing visual or audible messages that, for example, inform the patient whether the image is "acceptable" or if the "positioning" of the apparatus needs to be adjusted. (*Id*. at 26:20-28.) A true and correct copy of the WO '651 is attached hereto as Exhibit 6.

9.    The claims of the '409 patent simply apply this known method but purport to do so using generic computer elements such as a "deep learning device," which the patent admits was a well-understood, routine, and conventional feature. As the '409 patent explains, the "deep learning device" is "preferably a neural network [that] is trained with the learning base," and the patent acknowledges that "[a] 'neural network' or 'artificial neural network' is a set of algorithms well known to a person skilled in the art." ('409 patent at 16:13-16.)

## SIXTH DEFENSE

### (Invalidity of U.S. Patent No. 11,049,248)

10.    The claims of the '248 patent are invalid for failure to satisfy one or more of the conditions for patentability set forth in Title 35 of the United States Code, including but not limited to Sections 101, 102, 103, and 112 and the doctrine of obviousness-type double patenting.

11.    For example, and without limitation, the claims of the '248 patent are invalid for lack of subject-matter eligibility under 35 U.S.C. § 101.

12.    The claimed methods of the '248 patent are directed to the abstract idea of collecting and analyzing information to "assess[]" the shape of an orthodontic aligner." (*E.g.*, '248 patent at claim 1.)

13.    As DM's patents admit, this was conventionally done by an orthodontist through a "visual inspection" of a patient's teeth and the aligner (*e.g.*, '248 patent at 27:55-59; '945 patent at

1:43-45), either during an in-person visit or by viewing of images of the patient's dental arch that the patient sends to the orthodontist (*e.g.*, '248 patent at 1:11-15).

14.    The claims of the '248 patent do not specify any improvements in computer functionality or other technology, but rather simply enlist generic computer elements such as a "deep learning device" to implement the abstract ideas of assessing aligner shape using generic image capture devices and computer elements.

15.    To the extent the claimed methods of the '248 patent use a "deep learning device," the '248 patent admits this was a well-understood, routine, and conventional feature.  As the '248 patent explains, the "deep learning device" is "preferably a neural network [that] is trained with the learning base," and the patent acknowledges that "[a] 'neural network' or 'artificial neural network' is a set of algorithms well known to a person skilled in the art." ('248 patent at 16:5-8.)

## SEVENTH DEFENSE

### (Invalidity of U.S. Patent No. 11,109,945)

16.    The claims of the '945 patent are invalid for failure to satisfy one or more of the conditions for patentability set forth in Title 35 of the United States Code, including but not limited to Sections 101, 102, 103, and 112 and the doctrine of obviousness-type double patenting.

17.    For example, and without limitation, the claims of the '945 patent are invalid for lack of subject-matter eligibility under 35 U.S.C. § 101.

18.    The claimed methods of the '945 patent are directed to the abstract idea of collecting and analyzing information to "evaluate[]" the shape of an orthodontic aligner." (*E.g.*, '945 patent at claim 1.)  As DM's patents admit, this was conventionally done by an orthodontist through a "visual inspection" of a patient's teeth and the aligner (*e.g.*, *id.* at 1:43-45), either during an in-person visit (*id.*) or by viewing of images of the patient's dental arch that the patient sends to the orthodontist (*e.g.*, '248 patent at 1:11-15).

19.    The claims of the '945 patent do not specify any improvements in computer functionality or other technology, but rather simply enlist generic computer elements "such as image processing software" to implement the abstract ideas of "evaluating aligner shape."

20.     The '945 patent admits that the use of such "image processing software" was a well-understood, routine, and conventional feature.  As the '945 patent explains, "[a] person skilled in the art knows how to process an image in order to isolate an outline," that "[t]his processing for example involves the well-known application of masks or filters, which come with image processing software," and that "[s]uch processing operations for example make it possible to detect the regions of greatest contrast."  ('945 patent at 10:22-27.)  The patent goes on to list "known and preferred methods" of image processing operations (*id*. at 10:28-11:32) and states that "[t]ooth outline determination can be optimized by following the teachings of [prior art] PCT/EP2015/074900" (*id*. at 11:33-34).   A true and correct copy of PCT/EP2015/074900, published as WO 2016/066654A1 is attached hereto as Exhibit 7.

## EIGHTH DEFENSE

### (Limitations on Damages and Costs)

21.     Plaintiff's claims for damages are statutorily limited or barred by 35 U.S.C. §§ 286 and 287.

22.     Plaintiff also cannot prove that this is an exceptional case under 35 U.S.C. § 285, and Plaintiff is not entitled to enhanced damages or attorneys' fees.

23.     Plaintiff is further barred under 35 U.S.C. § 288 from recovering any costs associated with this action.

## NINTH DEFENSE

### (No Equitable Relief)

24.     Plaintiff is not entitled to equitable relief, including but not limited to Plaintiff's prayer for injunctive relief, as Plaintiff has an adequate remedy at law and cannot show that it has or will suffer any immediate or irreparable harm from Align's alleged conduct.

## RESERVATION OF RIGHTS

Align hereby reserves the right to amend its Answer and reserves all defenses set out in Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses, at law or in equity, that become applicable after the substantial completion of discovery or otherwise during the course of this litigation.

## ALIGN'S COUNTERCLAIMS AGAINST DENTAL MONITORING

1.  Defendant and Counterclaim Plaintiff Align Technology, Inc. ("Align") makes the following allegations and asserts the following Counterclaims against Plaintiff and Counterclaim Defendant Dental Monitoring SAS ("Dental Monitoring").

## NATURE OF COUNTERCLAIMS

2.  Align brings counterclaims for declaratory judgment of noninfringement and invalidity of U.S. Patent Nos. 10,755,409 ("the '409 patent"), 11,049,248 ("the '248 patent"), and 11,109,945 ("the '945 patent") (collectively, "the Asserted DM Patents"), which arise under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* Dental Monitoring alleges that it possesses the entire right, title, and interest in the Asserted DM Patents and that Align infringes these patents. Align denies that it infringes or has infringed any valid, enforceable, and properly construed claim of the Asserted DM Patents. There is a real, immediate, and justiciable controversy between Align and Dental Monitoring concerning the noninfringement and/or invalidity of the Asserted DM Patents.

3.  Align further brings counterclaims for infringement of United States Patent Nos. 7,156,661 ("the '661 patent"), 10,945,813 ("the '813 patent"), 11,589,743 ("the '743 patent"), and 11,589,957 ("the '957 patent") (collectively, "the Asserted Align Patents"), which arise under the patent laws of the United States, 35 U.S.C. § 1 *et seq.* There is a real, immediate, and justiciable controversy between Align and Dental Monitoring concerning the infringement of the Asserted Align Patents.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over Align's counterclaims pursuant to pursuant to federal question jurisdiction, 28 U.S.C. §§ 1331 and 1338(a); the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

5.  This Court has personal jurisdiction over Dental Monitoring at least because Dental Monitoring filed its Complaint against Align in this Court for patent infringement, thereby consenting to personal jurisdiction in this Court and purposefully availing itself of conducting activities both in the State of California and in this District.

6.    This Court additionally has personal jurisdiction over Dental Monitoring in that it has, directly or through agents and/or intermediaries, committed acts within the State of California and this District giving rise to this action and/or have established minimum contacts with the State of California and this District such that the exercise of jurisdiction would not offend traditional notions of fair play and justice.

7.    On information and belief, Dental Monitoring regularly conducts business in the State of California and this District and has purposefully availed itself of the privileges of conducting business in the State of California and this District.  In particular, on information and belief, Dental Monitoring, directly and/or through its agents and/or intermediaries, make, use, import, offer for sale, sell, and/or advertise their products and affiliated services in the State of California and this District.  Dental Monitoring has placed, and continues to place, products into the stream of commerce, via an established distribution channel, with the knowledge and/or understanding that such products are sold in the United States including in the State of California and this District.

8.    Dental Monitoring is further subject to personal jurisdiction in the United States and specifically in the State of California and this District pursuant to Fed. R. Civ. P. 4(k)(2).  Dental Monitoring has contacts with the United States that include, inter alia, advertising, offering to sell, and/or selling their products and software throughout the United States, including the State of California and this District.

9.    Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Dental Monitoring, as a foreign corporation, may be sued in any judicial district.  Dental Monitoring has further consented to venue in this District by filing its Complaint in this District.

## **FACTUAL BACKGROUND**

10.    For over a century, orthodontic treatment was an analog system, using wires and brackets to straighten teeth and treat malocclusions.  That changed in 1997 when Align introduced Invisalign, a malocclusion treatment system using clear aligners.  Like wires and brackets, clear aligners apply force to teeth to cause movement into proper alignment.  But Invisalign offered many benefits over wires and brackets including less patient discomfort and better oral health.  One

3:22-CV-7335-WHA
ALIGN TECHNOLOGY, INC.'S ANSWER AND COUNTERCLAIMS

1   benefit of Invisalign was the digitizing of the prior analog process.  Through its groundbreaking

2   innovations, Align used CAD/CAM software to precisely map each stage of tooth movement for

3   an entire treatment, and then created models of each stage before thermoforming proprietary plastic

4   over the molds to form Invisalign® aligners.

5       11.    But Align did not stop there, investing hundreds of millions in research and

6   development each year and the acquisition of complementary companies.  Today, the Align Digital

7   Platform provides an end-to-end digital solution for doctors and patients.  Invisalign patients can

8   benefit from an intraoral scanner that scans and creates a digital model of a patient's arch and

9   technology that facilitates patient and doctor interaction.  As an example of the latter, Align

10  developed websites to facilitate patient-doctor interactions including sharing photos of the

11  treatment.

12      12.    Beginning at the latest in 2014, Align explored and developed ways for patients and

13  doctors to interact with each other through enhanced technology, including technology-aided

14  progress tracking and patient mobile apps culminating in the launch of the MyInvisalign® App in

15  February 2018, which was the next iteration of Align's patient facing website.  When COVID-19

16  hit, Align accelerated the development of the MyInvisalign® App to enhance its remote monitoring

17  features, called VirtualCare.  The enhancements used doctor guidance and technology to compare

18  a patient's smile to the treatment plan—a service that no other company can offer because of

19  Align's proprietary software and technology.  To protect its innovations, Align has applied for and

20  obtained patent protection, holding over 800 patents worldwide.

21      13.    A decade and a half after Align launched Invisalign® and years after Align began

22  using online systems to facilitate remote patient-doctor interaction, new industry players like Dental

23  Monitoring entered the market in an attempt to piggyback on the demand for Align's innovative

24  products.  Since its founding in 2014, Dental Monitoring has focused its efforts on a remote-

25  monitoring platform with a primary focus on clear aligner therapy.  Dental Monitoring's platform

26  is not new, but rather just the latest attempt to capitalize on Align's vision of digital dentistry.

27  Through this platform, Dental Monitoring has used Align's patented technology without

28  permission in an apparent effort to catch up to Align's innovations.  Rather than investing the time,

money, and energy to develop unique technologies, Dental Monitoring has taken an improper shortcut by using Align's inventions. Align therefore brings these counterclaims to stop the irreparable harm that it has suffered and will continue to suffer from Dental Monitoring's infringement.

### A.    ALIGN

14.    Align is a global medical device company that invents, makes, and sells innovative products that help dental and orthodontic professionals deliver effective, cutting-edge options to their patients.

15.    Align is a pioneer. Founded in 1997, Align has blazed the trail for follow-on competitors like Dental Monitoring and countless others who did not enter the space until decades later. Align's innovations have resulted in hundreds of U.S. and foreign-issued patents "covering everything from the type of plastic that's worn in patients' mouths to the software orthodontists use to plan out teeth movements millimeter-by-millimeter, months in advance." ("*Out Of Silicon Valley, A Billion-Dollar Orthodontics Business Built With Plastic And Patents*," Forbes (Apr. 25, 2017), https://www.forbes.com/sites/michelatindera/2017/04/25/out-of-silicon-valley-a-billion-dollar-orthodontics-business-built-with-plastic-and-patents/?sh=2b58f66930c2, a true and correct copy of which is attached hereto as Exhibit 8.)

16.    Align is well known for its Invisalign® system for treating malocclusion based on a series of doctor-prescribed, custom manufactured, clear plastic, removable aligners. The Invisalign® clear aligners straighten teeth using a series of customized clear trays that can be removed (e.g., for eating and teeth cleaning), have no metal brackets or wires to cause irritation, require significantly less time in the orthodontist's chair than traditional metal braces, and provide a quicker treatment plan compared to traditional metal braces. Align uses three-dimensional computer modeling software (CAD/CAM) to design a custom treatment plan for each patient based on the patient's current tooth arrangement and desired result. Then, using 3D printers, Align creates models of each treatment stage in accordance with the patient's plan, and those models are used to thermoform proprietary plastic molds to create Invisalign® aligners. Unlike treatment by traditional

metal braces, Align's modeling software provides detailed information for tracking the progress of a patient's treatment within a fraction of a millimeter.

17.    Align also is known for its iTero® intraoral scanners, which scan and provide color 3D imaging of an intraoral surface, such as the teeth and gums, without drying and powdering the intraoral surface, resulting in a digital impression.  Align's iTero® intraoral scanners thus eliminate the need for traditional teeth impressions typically taken with polyvinyl siloxane putty.  Align's iTero® scanners have been recognized in the industry for its innovative features.  (*See, e.g.*, "*Align Technology Wins Software - Healthcare Technology Category in SBR Technology Excellence Awards 2022 - Recognising its iTero Element 5D Plus Imaging System*," Singapore Business (2022),  available  at:  https://sbr.com.sg/event-news/align-technology-wins-software-healthcare-technology-category-in-sbr-technology-excellence-awards-2022-recognising-its-itero,  a  true  and correct copy of which is attached hereto as Exhibit 9; "*Align Technology Introduces Latest iTero-exocad Connector™ Software Release That Enables Advanced Visualization for Doctors and Labs, With Seamless Integration of iTero™ Intraoral Camera and NIRI Images Within exocad*," BusinessWire (Oct. 3, 2022), https://www.businesswire.com/news/home/20221003006032/en/, a true and correct copy of which is attached hereto as Exhibit 10 ("'As a participant in the limited market release, I found that the intraoral camera images are sharp, and this allowed us to choose margins much better and the way that integrates with exocad is fantastic. iTero NIRI images allow us to estimate levels of translucency. This is the kind of innovation that makes our jobs easier, better, and more reliable. It's a big thumbs up from us,' said Ashley Byrne, CDT, owner of Byrnes Dental Laboratory, UK.").)

18.    The digital impression captured by Align's iTero® intraoral scanners can be used in a variety of dental and orthodontic applications such as, for example, tracking a patient's progress during the Invisalign® treatment, tracking changes in a patient's dentition over time, mapping the occlusion of a patient's teeth, and correcting inaccurate scan data.

19.    Align's iTero® intraoral scanner is a high-precision, high-speed intraoral scanner that can be used to create a variety of orthodontic and dental devices including, but not limited to, crowns,  bridges,  bracket  templates,  aligners,  and  implants.   Each  dental  device  is  custom

manufactured for each patient using computer-aided design techniques and sophisticated computer graphic interfaces to communicate with the patient's dental or orthodontic professional in the planning, implementation, and revision of the customized treatment program.

20.    Align's Invisalign® system, developed by Align over many years and at great expense and effort, represent a breakthrough in the manufacturing principle of "mass customization" and a vast improvement over conventional methods for treating, among other things, chipped or missing teeth, misalignment of teeth and malocclusion.

21.    As a natural next step to provide Invisalign® system more widely to its customers, Align started developing its patient-facing Invisalign® website.  This website enabled patients to keep track of their Invisalign® treatment plans and remain connected with their doctor's guidance between visits.  Align continued to develop ways for patients and doctors to interact with each other through technology aided progress tracking and patient mobile apps, culminating in the launch of the MyInvisalign® App.

22.    Over the years, Align continued to develop and provide new features for the MyInvisalign® App to engage and empower patients.  During the COVID-19 pandemic, Align accelerated the development of the MyInvisalign® App to enhance its remote monitoring features, called Invisalign® Virtual Care, a solution that allows doctors to virtually monitor Invisalign® treatment between in-office visits.  Invisalign® Virtual Care allows patients to submit progress photos of their Invisalign® treatment through the My Invisalign® App and doctors to view the submitted photos on their Invisalign® Doctor Site and provide treatment feedback to patients. Align's Virtual Care platform has been recognized with numerous accolades for its innovative design.  (*See*, e.g., "*Align Technology Wins Digital Innovation of the Year - Singapore category at HCA    Medtech    Asia    Awards*,"    HealthCareAsia    (2022),    available    at: https://healthcareasiamagazine.com/co-written-partner/event-news/align-technology-wins-digital-innovation-year-singapore-category-hca-medtech-asia-awards, a true and correct copy of which is attached hereto as Exhibit 11 ("Align Technology has won 'Digital Innovation of the Year' for its Invisalign Virtual Care and Invisalign Virtual Appointment tools that offer a seamless end-to-end digital experience for Invisalign doctors and their patients"); "*Align Technology Wins 'Best Virtual*

*Care Platform' Award from Medtech Breakthrough*" Align Press Release (May 6, 2021), available at: https://investor.aligntech.com/news-releases/news-release-details/align-technology-wins-best-virtual-care-platform-award-medtech, a true and correct copy of which is attached hereto as Exhibit 12 ("'Invisalign Virtual Care provides Invisalign patients with seamless, personalized experiences that improve the customer experience, while also enabling revenue growth for doctors,' said James Johnson, managing director, MedTech Breakthrough. 'It is clear that responsible virtual care represents a significant component of healthcare moving forward and Align is a leading innovator in this space.'"); "*Align Technology awarded for innovative virtual patient care app at Asian Experience Awards*" The Asian Business (2022), available at: https://asianbusinessreview.com/healthcare/event-news-more-news/align-technology-awarded-innovative-virtual-patient-care-app-asian-experience-awards, a true and correct copy of which is attached hereto as Exhibit 13; "*Align Technology wins a Stevie® Award in The 2022 International Business Awards®*," The Stevie Awards Video, available at: https://www.youtube.com/watch?v=Y3T0_fQojkI; 2022 Gold Stevie® Winner for "Integrated Mobile Experience," https://stevieawards.com/iba/mobile-site-app-awards-category-winners, a true and correct copy of which is attached hereto as Exhibit 14.)  Align's Virtual Care platform is also highly regarded by practitioners in the industry.  (*See, e.g.,* "*Align Technology's Next Generation Invisalign Virtual Care AI-assisted Remote Monitoring Solution Automates and Streamlines Practice Workflows*," BusinessWire (Sept. 28, 2022), https://www.businesswire.com/news/home/20220928006013/en/, a true and correct copy of which is attached hereto as Exhibit 15 ("'Invisalign Virtual Care AI has transformed how I follow the treatment progress of my Invisalign patients,' said Dr. Jan Einfeldt, a GP dentist located in Kent, United Kingdom…'Invisalign Virtual Care AI is now the gold standard of follow up across all procedures in my practice that include Invisalign treatment.'").)

23.    Align also offers the Invisalign® Practice App that helps practitioners streamline their workflow through single convenient application.  The Invisalign® Practice App includes features like the Invisalign® Photo Uploader, Virtual Care, Virtual Appointment and Smileview™ simulation.  (*See* https://www.invisalign.com/provider/treatment-solutions, a true and correct copy

1    of which is attached hereto as Exhibit 16.)  Smileview™ provides "a simulation of what your

2    patient's smile could look like after Invisalign treatment." (*Id.*)  Invisalign® Virtual Appointment

3    enables practitioners "to schedule video appointments to discuss Invisalign treatment with [their]

4    patients before bringing them into [the] office for an exam." (*Id.*).

5        **B.    The Align Asserted Patents**

6            **1.    Align's U.S. Patent No. 7,156,661**

7        24.    On January 2, 2007, the U.S. Patent and Trademark Office duly and lawfully issued

8    the '661 patent, entitled "Systems and Methods for Treatment Analysis by Teeth Matching,"

9    naming Woncheol Choi, Jihua Cheng, and Eric Kuo as inventors.  Align is the owner by assignment

10   of all right, title, and interest in the '661 patent and has the exclusive right to bring suit to enforce

11   the '661 patent, including the recovery of damages for past infringement.  Evidence of such

12   assignment has been recorded with the U.S. Patent and Trademark Office at Reel/Frame

13   016300/0634.

14       25.    The claims of the '661 patent are directed to inventions related to the field of

15   orthodontics and specifically to "systems and methods for measurement of teeth movements."

16   ('661 patent at 1:13-15.)  The patent claims address the "limitations" arising from "manual

17   measurement to measure dental features and orthodontic properties." (*Id.* at 1:33-36.) For example,

18   since manual measurements are "manual processes and two dimensional measurements," the

19   measurement results "are not very precise and the rotation is difficult to measure. (*Id.* at 1:35-39.)

20   The patent claims also address the limitations brought about by use of "serial head films to describe

21   changes in tooth movement in the anterior-posterior and vertical dimensions," such as "radiation to

22   the patient, magnification errors, operator errors, and stable and reliable anatomic reference points."

23   (*Id.* at 1:39-44.)

24       26.    The claims of the '661 patent provide a solution that involves "taking two digital

25   models, one before treatment and one after treatment, superimposing them in a virtual space, and

26   calculating the movement of each tooth." (*Id.* at 2:16-18.)  There are several advantages to the

27   solution presented by the '661 patent.  For example, using digital models allows for "precise

28   measurement and movement analysis." (*Id.* at 2:9-10.) In particular, "three-dimensional rigid body

1   analysis" allows for calculation of "accurate and complete movement of a tooth or the entire jaw."

2   (*Id.* at 2:10-12.)   The digital analysis also provides "a complete rigid body movement, three

3   translations and three rotations, for each and every tooth," (*Id.* at 2:21-23), which could not be

4   provided by manual measurements.

5        27.   Further, the digital analysis provided in the patent claims of the '661 patent allows

6   for use in "a virtual treatment plan," such that "the clinician can evaluate treatment options in detail

7   before beginning treatment" and "serve as a constant objective reference during office visits so that

8   planned treatment goals can be kept visible."  (*Id.* at 2:24-28.)  Performing such analyses during

9   treatment is valuable because it "allows adjustments to be made to a treatment in progress should

10   it go off course from the original intended plan."  (*Id.* at 2:52-53.)

11       **2.**    **Align's U.S. Patent No. 10,945,813**

12        28.   On March 16, 2021, the U.S. Patent and Trademark Office duly and lawfully issued

13   the '813 patent, entitled "Providing a Simulated Outcome of Dental Treatment on a Patient,"

14   naming Yingjie Li, Chao Shi, Zelko Relic, Michael Alan Stocks, Audrey Bushev, Ya Xue, and Eric

15   P. Meyer as inventors.  Align is the owner by assignment of all right, title, and interest in the '813

16   patent and has the exclusive right to bring suit to enforce the '813 patent.  Evidence of such

17   assignment has been recorded with the U.S. Patent and Trademark Office at Reel/Frame

18   056405/0637.

19        29.   The claims of the '813 patent are directed to inventions related to "simulating dental

20   treatment of a patient's teeth, and particularly to providing a more photo-realistic rendering of a

21   two-dimensional (2D) image of a patient that represents one or more simulated (e.g., estimated

22   and/or intended) outcomes of a dental treatment plan." ('813 patent at 1:61-65.)  The patent claims

23   address the need to help individuals who "may not know whether or not they should receive

24   orthodontic treatment" or "may not know whether or not orthodontic treatment is appropriate or

25   desirable for them."  (*Id.* at 1:39-43.)  This need is exacerbated by the fact that many orthodontic

26   treatment plans may affect the way an individual looks, for example by treatment with "braces,

27   brackets, wires, and/or polymeric appliances."  (*Id.* at 1:30.)

28

30.    The systems and methods covered by the claims of the '813 patent involve "obtaining a two-dimensional (2D) representation (such as an image) of a patient's dentition, obtaining one or more parameters to represent attributes of the patient's dentition in the 2D representation, and using the one or more parameters to compare the attributes of the patient's dentition with attributes of model arches, such as those of historical cases and/or those representing idealized arch forms." (*Id.* at 1:31-38.)  This solution allows for people to "visualize examples of their smiles without malpositioned teeth and/or jaws, e.g., after estimated and/or intended dental treatment(s), after insertion of implants or other devices, with configurations that would be appropriate for their face, age, heritage, and/or lifestyle, etc." (*Id.* 1:44-49.)  Thus, patients can see a realistic visualization of a simulated orthodontic treatment before deciding whether to pursue the treatment.

### 3.    Align's U.S. Patent No. 11,589,743

31.    On February 28, 2023, the U.S. Patent and Trademark Office duly and lawfully issued the '743 patent, entitled "Cheek Retractor and Mobile Device Holder," naming Eric P. Meyer, Roman A. Roschin, Tzishing Jesse Lim, Palak Mittal, Stephan Albert Alexandre Dumothier, Norman C. Su, and Huameng Ivan Chu as inventors.  Align is the owner by assignment of all right, title, and interest in the '743 patent and has the exclusive right to enforce the '743 patent.  Evidence of such assignment has been recorded with the U.S. Patent and Trademark Office at Reel/Frame 061261/0513.

32.    The claims of the '743 patent are directed to inventions related to "case assessment and/or dental treatments." ('743 patent at 1:23-24.)  The claims address issues with traditional dental treatments with a set of appliances, namely that such treatment "may involve repeated patient visits to an orthodontist in order to verify the dental treatment is proceeding as anticipated." (*Id.* at 1:61-63.)  Such repeated visits are "time consuming" and may require a patient "to significantly alter their daily schedule in order to visit an orthodontist." (*Id.* at 1:4-6.)  While sending photos of a patient's teeth to a practitioner may reduce the need for repeated visits, "the process of taking photographs of a patient's teeth can be cumbersome without assistance." (*Id.* at 2:13-14.)  It is

difficult for a patient to take consistent photographs of sufficient quality between treatments. (*See id.* at 2:15-22.)

33.     The systems and methods covered by the claims of the '743 patent address these needs by presenting a solution including a "cheek retractor" attachable to a "mobile device holder" that can hold a "mobile device to capture images of the patient's teeth" (*id.* at Abstract, FIG. 2A), where a user interface displayed on the mobile device can "instruct the user…to take a photograph and/or video of the user's teeth at specified distances and/or angles from the user's teeth" (*id.* at 21:13-15). The solution provides several advantages. For example, it "simplif[ies] taking images of teeth of patients and/or prospective patients." (*Id.* at 3:10-11.) The resulting images also include "more consistent distances and/or angles from patients' teeth, allowing for more accurate scaling and rendering than images with inconsistent distances and/or angles from patients' teeth." (*Id.* at 3:12-15.) The inventions of the claims of the '743 patent are "useful for progress tracking for current patients and/or determining whether various dental treatments will work on prospective patients." (*Id.* at 3:16-18.)

### 4.     Align's U.S. Patent No. 11,589,957

34.     On February 28, 2023, the U.S. Patent and Trademark Office duly and lawfully issued the '957 patent, entitled "Methods and Apparatuses for Dental Images," naming Maurice K. Carrier, Jr., Phillip Thomas Harris, Sergey Vinnichenko, Samuel Blanco, Aleksandr Sergeevich Karsakov, Sebastien Hareng, and Leon Rasovsky as inventors. Align is the owner by assignment of all right, title, and interest in the '957 patent and has the exclusive right to enforce the '957 patent. Evidence of such assignment has been recorded with the U.S. Patent and Trademark Office at Reel/Frame 062429/0387 and Reel/Frame 062429/0413.

35.     The claims of the '957 patent are directed to inventions related to "obtain[ing] an image, or a set of images, of a patient's teeth from one or more predetermined viewing angles." ('957 patent at Abstract.) The claims address the need for an alternative to traditional dental photography using a single-lens reflex camera, which "is expensive" and to which it "may be difficult to align the teeth of a patient." (*Id.* at 1:48-49.) The traditional photography process "may also be uncomfortable to the patient." (*Id.* at 1:49-50.) Taking photos using a mobile phone can

1  also present problems regarding photo quality due to the difficulty in taking photos at the right

2  distance from the teeth. (*See id.* at 1:50-58.)

3      36.    The systems and methods covered by the claims of the '957 provide a solution

4  involving "guiding or assisting in taking a predetermined set of images of the patient's teeth from

5  specified viewing angles." (*Id.* at 2:11-13.) For example, "an overlay may be shown over a camera

6  image while preparing to take a picture of the teeth," where "the overlay may guide the user…in

7  taking the images." (*Id.* at 2:21-24.) The overlay may be used to "improve the image quality" by

8  "automatically focus[ing] the imaging only within the region defined by the overlay." (*Id.* at 7:15-

9  19.) When the overlay approximately matches the patient's teeth, a "visual, audible or visual and

10  audible indicator" may be triggered "that permits the user to take the image." (*Id.* at 9:15-19.) The

11  solution improves on existing technology by "enhancing and/or confirming the image quality" and

12  "associating patient information and transmitting the set of images so that they may be used in a

13  dental/orthodontic procedure." (*Id.* at 15:45-51.)

14      **C.    Dental Monitoring**

15      37.    Dental Monitoring was founded in 2014, 17 years after Align. While Dental

16  Monitoring's business focuses on its remote dental monitoring platform, Dental Monitoring has not

17  been able to generate foundational innovations.

18      **D.    Accused Dental Monitoring Products**

19          **1.    ScanBox pro and ScanBox**

20      38.    As shown on Dental Monitoring's website, the ScanBox pro can be used with the

21  DentalMonitoring application to "track[] a progress of an orthodontic procedure for repositioning

22  misaligned teeth of a patient." (*See, e.g.*, https://dental-monitoring.com/for-patients/, a true and

23  correct copy of which is attached hereto as Exhibit 17.) Dental Monitoring directs its "patients [to]

24  self-photograph their mouths with their smartphones in the comfort of their own homes (or

25  anywhere else) … to assist the dental professionals, especially during orthodontic treatment, in

26  tracking treatment progress by following tooth movement." (Complaint at ¶ 9.)

27      39.    On information and belief, the functionality of the ScanBox pro is substantially

28  similar to the ScanBox. (*See, e.g.*, "ScanBox pro: Because innovation never stops," https://dental-

-26-

1  [monitoring.com/scanbox-pro-launch/](monitoring.com/scanbox-pro-launch/), a true and correct copy of which is attached hereto as Exhibit

2  18 ("The ScanBox pro takes the utility of the original DM ScanBox and streamlines its design,

3  improves the quality of images captured, and creates more consistent scans.").)

4      40.    The ScanBox pro includes a "phone support" that is a mobile device holder.



*(See, e.g.,* Ex. 17.)

    41.    The "phone support" includes a base and adjustable stops.

1
2
3
4
5
6
7
8
9
10
11

(*See, e.g.*, "Dental Monitoring Instructions" Video (YouTube, available at:
https://www.youtube.com/watch?v=ekixq7oPDK0).)

12

13    42.    The base and adjustable stops of the "phone support" is configured to provide a

14    compressive force on a mobile device of a patient.

15

 

(*Id.*)

26    43.    The ScanBox pro includes a "Cheek Retractor Tube."

27
28

-28-

## What type of plastic is the Cheek Retractor Tube made of?

The Cheek Retractor Tube is made of **BPA-free medical-grade plastic USP Class VI**. It complies with FDA requirements in the code of Federal Regulations in 21 CFR 177.1520 for food contact. This product passed the US Pharmacopoeia test (USP class VI ) and can be used for medical purposes. It is registered in the FDA Drug Master File list.

(*See, e.g.*, Ex.17.)

44.     The "Cheek Retractor Tube" is configured to be attached to the "phone support."



(*See, e.g.*, "Dental Monitoring Instructions" Video (YouTube, available at: https://www.youtube.com/watch?v=ekixq7oPDK0).)

45.     The "Cheek Retractor Tube" is configured to be inserted into the mouth of the patient while the smartphone is attached to the "phone support."



(*See, e.g.*, "BOSS - Best Orthodontic Seminars & Sessions" Video (YouTube, available at: https://www.youtube.com/watch?v=NuLLIkVvPIY).)

46.    The ScanBox pro is configured to be used with any "recent smartphone."

## Which smartphones are compatible?    —

Practically all recent smartphones are compatible, with a minimum of Android 5 (with flash) or iOS 10.

(*See, e.g.*, Ex. 17.)

### 2.    Dental Monitoring Platform

#### a.    Patient-Facing App

47.    The DentalMonitoring app runs on the patient's smartphone.

## Which smartphones are compatible?    —

Practically all recent smartphones are compatible, with a minimum of Android 5 (with flash) or iOS 10.

(*See, e.g.*, Ex. 17.)

48.    The DentalMonitoring app displays an interactive user interface via the display of the smartphone.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



(*See, e.g.*, Ex. 17.)

15
16
17
18
19
20
21
22
23
24
25
26
27
28



(*See, e.g.*, "Dental Monitoring Instructions" Video (YouTube, available at:
https://www.youtube.com/watch?v=ekixq7oPDK0).)

1

2

3

4

5

6

7

8

9

10



(*See, e.g.*, Ex. 17.)

11    49.    The DentalMonitoring app provides instructions to the patient via its user interface.

12    For example, the DentalMonitoring app displays the text "Place the phone into the phone support

13    and latch it in" on the screen of the smartphone.  The DentalMonitoring app also displays the text

14    "Connect the Cheek Retractor Tube to the Phone Support and insert the Cheek Retractor Tube into

15    your mouth" on the screen of the smartphone.

16

17

18

19

20

21

22

23

24



25    (*See, e.g.*, "Dental Monitoring Instructions" Video (YouTube, available at:

26    https://www.youtube.com/watch?v=ekixq7oPDK0).)

27    50.    The DentalMonitoring app provides instructions to the patient while taking a

28    photograph and/or video of the patient's teeth with the smartphone's camera.  For example, the

1    Dental Monitoring app displays by video a moving arrow and progress bar that instruct the patient

2    to move the phone support and connected smartphone in a left or right direction relative to the

3    mouth of the patient while the Cheek Retractor Tube is in position and the patient's jaw is closed.

4    The Dental Monitoring app also displays by video a moving arrow and progress bar that instruct

5    the patient to move the phone support and connected phone in a left or right direction relative to

6    the mouth of the patient while the Cheek Retractor Tube is in position and the patient's jaw is open.

7    During capture of the sets of images of the patient's teeth, the DentalMonitoring app running on

8    the smartphone displays video from the smartphone camera to the smartphone's display.

9

10

11

> Next, you'll take photos of your smile from anywhere using the ScanBox^pro (at the frequency your doctor recommends) and send them in through the app.

(*See, e.g.*, Ex. 17.)



(*See, e.g.*, "Dental Monitoring Instructions" Video (YouTube, available at:
https://www.youtube.com/watch?v=ekixq7oPDK0).)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



(*Id.*)



(*Id.*)



(*Id.*)

51.    The retractor tube positions the smartphone camera to take photographs or videos of the patient's teeth when the patient has the Cheek Tractor Tube inserted in their mouth.  For example, "the phone camera is in the middle of the Retractor Tube and adjust[ed] if needed." *See* Dental    Monitoring    Instructions"    Video,    YouTube,    available    at: https://www.youtube.com/watch?v=ekixq7oPDK0).

52.     The DentalMonitoring app takes photographs or videos using the smartphone camera.  For example, "[e]ach photograph examination consisted of 7 photographs: right posterior, right canine, center, left canine, left posterior, maxillary occlusal, and mandibular occlusal" and "[e]ach video examination consisted of 3 videos (6 seconds long): right posterior to the left canine, right canine to left posterior, and maxillary occlusal to mandibular occlusal."  Morris et al., "*Accuracy of Dental Monitoring 3D digital dental models using photograph and video mode*," Am. J. Orthod. Dentofacial Orthop., Vol. 156, 422 (Sept. 2019), a true and correct copy of which is attached hereto as Exhibit 19.  The examinations are captured by smartphones, such as "iPhone 7 mobile devices," which can run "the DM mobile application locked in photograph mode" or "locked in video mode."  *Id*.  Dental Monitoring also directs its "patients [to] self-photograph their mouths with their smartphones."  (Complaint at ¶ 9.)

53.     Upon capture of the photographs and/or videos of the patient's teeth, the DentalMonitoring app displays feedback.  For example, the DentalMonitoring app displays an indicator (e.g., a check mark) indicating that a photograph and/or video was successfully captured.



(*See, e.g.*, "BOSS - Best Orthodontic Seminars & Sessions" Video (YouTube, available at: https://www.youtube.com/watch?v=NuLLIkVvPIY).)

54.     Once the photographs and/or videos of the patient's teeth are captured, the DentalMonitoring app also displays feedback to help the patient "to ensure [the patient has] scanned

-36-

1    correctly." *See* "Dental Monitoring Instructions" Video (YouTube, available at:

2    https://www.youtube.com/watch?v=ekixq7oPDK0).  The feedback allows the patient to confirm

3    that the patient is "biting down on [their] back teeth," "[a]ll…teeth are fully visible," "back teeth

4    are fully visible," and the patient is "not wearing…aligners." *Id*.



(*See id*.)

16    55.    Once the photographs or videos of the patient's teeth are captured, the

17    DentalMonitoring app allows the patient to review the captured photographs and/or videos before

18    sending them to a doctor.

(*Id.*)

56.     The DentalMonitoring app transmits and uploads the captured photographs or videos of the patient's teeth to send to a professional (e.g., dental or orthodontic practitioner) for review.  For example, the DentalMonitoring app allows "the patient [to] take[] pictures of his/her teeth, which are uploaded into DM's system."  *Straumann Group invests in Dental Monitoring (DM), a pioneer in remote monitoring enabled by artificial intelligence,*" https://www.straumann.com/group/en/shared/news/corporate-news/2018/2051484.html (Apr. 12, 2018), a true and correct copy of which is attached hereto as Exhibit 20.  This "enables dentists to monitor the progress of orthodontic/dental treatments without the patient having to visit the practice." *Id.* Dental Monitoring also directs "patients [to] self-photograph their mouths with their smartphones in the comfort of their own homes (or anywhere else) … to assist the dental professionals, especially during orthodontic treatment, in tracking treatment progress by following tooth movement."  (Complaint at ¶ 9.)



(*See, e.g.*, "Dental Monitoring Instructions" Video (YouTube, available at:
https://www.youtube.com/watch?v=ekixq7oPDK0) ("Wait for the scan to upload and leave the
app open until it has submitted").)

Next, you'll take photos of your smile from anywhere using the ScanBox^pro (at the frequency your doctor recommends) and send them in through the app.

Your doctor will receive your photos to review your treatment and ensure it's on track without the need for unnecessary trips to the office. The doctor will send communication and guidance on your treatment via the app.

(*See, e.g.*, Ex. 17.)

**b.    Backend Processing**

57.    In addition, the patient-facing mobile application, the Dental Monitoring platform
includes a tooth movement tracking algorithm and an online Doctor Dashboard.

58.    Dental Monitoring's patents or publications, including U.S. Patent No. 10,799,321
("'321 patent") and U.S. Patent No. 11,246,688 ("'688 patent"), referenced herein have been listed

on Dental Monitoring's website as one of the granted patents "on [Dental Monitoring's] technology and hardware." *See* Dental Monitoring website, Internet Archive (Mar. 30, 2023), https://web.archive.org/web/20230330151607/https://dental-monitoring.com/patents/, a true and correct copy of which is attached hereto as Exhibit 21, as accessed by the Internet Archive on March, 30, 2023. A true and correct copy of the '321 patent is attached hereto as Exhibit 22 and a true and correct copy of the '688 patent is attached hereto as Exhibit 23.

59.    The Dental Monitoring platform provides a system for matching computer models of the patient's jaw with a preceding computer model of the patient's jaw. For example, the Dental Monitoring platform "construct[s] 3-dimensional (3D) digital models" from "photographs or video scans taken by patients." Ex. 19 at 420-21. The doctor "first uploads an initial 3D digital model in stereolithography (STL) file format" after which "[t]he patient then takes a pretreatment video or photograph examination with a DM-patented cheek retractor, using the DM application on their own smartphone." *Id*. at 421. The Dental Monitoring platform "uses the initial scan and pretreatment video or photograph examination to establish a baseline of tooth position and occlusion from which to calculate future movements." *Id*. For future examinations, the Dental Monitoring platform "use[s] the immediately preceding 3D model to perform calculations to produce the next 3D model." *Id*.

60.    Dental Monitoring's patents also show a system for matching computer models of the patient's jaw with a preceding computer model of the patient's jaw. For example, the '321 patent describes that "[a] method for monitoring the position of the teeth of a patient includes the following steps: a) modeling a target position of the teeth in the form of a target model; b) after a time interval, modeling an updated position of the teeth in the form of an updated model; c) comparing the target and updated models." ('321 patent at Abstract.) The '688 patent also describes "[a] method for monitoring the shape of teeth" that includes the step of "comparing the shapes of the initial reference model and of the reference model obtained at the end of the preceding steps, referred to as 'final reference model', in order to determine the deformation and/or the movement of teeth between steps a) and b)." ('688 patent at Abstract.)

61.     The Dental Monitoring platform uses a tooth movement tracking algorithm to calculate movements of teeth positions based on the computer models.  For example, the Dental Monitoring platform "uses the initial scan and pretreatment video or photograph examination to establish a baseline of tooth position and occlusion from which to calculate future movements." Ex. 19 at 421.  Future examinations "then use the immediately preceding 3D model to perform calculations to produce the next 3D model." *Id*.  The '321 patent also describes "[a] method for monitoring the position of the teeth of a patient" that includes "a) modeling a target position of the teeth in the form of a target model; b) after a time interval, modeling an updated position of the teeth in the form of an updated model; c) comparing the target and updated models."  ('321 patent at Abstract.)  The '688 patent further describes "[a] method for monitoring the shape of teeth" that involves "comparing the shapes of the initial reference model and of the reference model obtained at the end of the preceding steps, referred to as 'final reference model', in order to determine the deformation and/or the movement of teeth between steps a) and b)."  ('688 patent at Abstract.)

62.     Dental Monitoring's online Doctor Dashboard "loads a first computer model of a jaw having teeth in initial positions."  For example, "an initial 3D digital model" is used to "establish a baseline of tooth position and occlusion from which to calculate future movements." Ex. 19 at 421; *see also* Moylan, "*Accuracy of a smartphone-based orthodontic treatment monitoring application*" (2018), a true and correct copy of which is attached hereto as Exhibit 24 ("To initiate remote monitoring, the orthodontist uploads a stereolithography (STL) file of the patients' initial models to the Dental Monitoring platform to define the baseline tooth position"). The online Doctor Dashboard loads the initial 3D digital model into Dental Monitoring's platform for matching computer models.  The 3D model is of the "patients' arches," which corresponds to the jaw.  Roisin et al., "*Remotely-controlled orthodontics: fundamentals and description of the Dental Monitoring system*," J. Dentofacial Anom. Orthod., 6 (2016), a true and correct copy of which is attached hereto as Exhibit 25.

63.     Dental Monitoring's online Doctor Dashboard loads a "next" or "new" 3D model based on a "preceding" 3D model (e.g., the initial model), which corresponds to "loading a second computer model of the jaw."  For example, following the loading of the initial scan, "[s]uccessive

1   DM examinations then use the immediately preceding 3D model to perform calculations to produce

2   the next 3D model." Ex. 19 at 421. In other words, once "a progress intraoral scan or a finishing

3   scan has been made, this scan can be uploaded to DM and this new 3D model can then be used as

4   a reference." P. Salah and K. H. Breuning, *Monitoring of Tooth Movement*, Digital Planning and

5   Custom Orthodontic Treatment, 1st Ed., 59 (2017), a true and correct copy of which is attached

6   hereto as Exhibit 26. The online Doctor Dashboard loads the new 3D digital model into Dental

7   Monitoring's platform for matching computer models. The positions of some teeth in the new 3D

8   model and in the preceding 3D model are different because the new 3D model "serve[s] as the basis

9   for tooth-movement calculations." Kravitz et al., "*Teledentistry, Do-It-Yourself Orthodontics, and*

10  *Remote Treatment Monitoring*," J. Clinical Ortho., 725 (Dec. 2016), a true and correct copy of

11  which is attached hereto as Exhibit 27. The new 3D model is of the patients' "arches," which

12  corresponds to the jaw. Ex. 25 at 6.

13          64.     The Dental Monitoring platform's comparison of the computer models involves

14  "identifying at least one reference point on a region of the first computer model" and "identifying

15  a corresponding reference point on a corresponding region of the second computer model for each

16  point identified on the first model." For example, the comparison of the computer models involves

17  "selecting, on each of the models, three points corresponding to identical sites" ('321 patent at 7:41-

18  42) and "comparison of the spatial coordinates of the points of the surfaces defined by these two

19  reference models." ('688 patent at 33:5-8.) The '321 patent explains "[a]lgorithms for comparison

20  between two three-dimensional models" in which "[a] three-dimensional target model is []

21  compared to a three-dimensional updated model, for example obtained by 3D extrapolation of 2D

22  representations." ('321 patent at 7:34-42.) The comparison is carried out "automatically or semi-

23  automatically using…3D best-fit algorithms or manually using 3D alignment tools, especially by

24  selecting, on each of the models, three points corresponding to identical sites." (*Id*.) The '688

25  patent also explains that "the final reference model, resulting from the optimization by movement

26  of the tooth models, is compared with the initial reference model" and that the comparison "makes

27  it possible to observe the differences between the positioning of the teeth in the…initial reference

28  model…and during the acquisition of the updated image." ('688 patent at 29:50-59.) Specifically,

1    "[t]he comparison of the initial and updated reference models comprises the comparison of the

2    spatial coordinates of the points of the surfaces defined by these two reference models" and makes

3    it possible "to deduce therefrom any modifications of shape" between the models. (*Id.* at 33:5-9.)

4        65.    The identified points can be from portions of the jaw other than the teeth. For

5    example, the '688 patent explains that "an initial reference model of the arches, or of a part of the

6    arches of the patient is created (see FIG. 2)" and that "[t]he initial reference model is a digital model

7    in three dimensions of the arches of the patient." ('688 patent at 12:46-52.) The '688 patent further

8    describes that the "initial reference model" can include a "tooth model" that "is delimited by "a

9    gingival edge which can be broken down into an interior gingival edge…, an exterior gingival

10   edge…and two lateral gingival edges." (*Id.* at 14:16-35.) The gingival edges "correspond to

11   regions in which the orientation of the surface defined by the initial reference model undergoes

12   modifications of high amplitude" and "[t]hese variations of orientation can be identified according

13   to known techniques, for example by identifying the changes of direction of the normal to the

14   surface modelled" as shown in FIG. 4a. (*Id.*)



15

16

17

18

19

20

21                          (*See. e.g.*, '688 patent at FIGs. 2 and 4a)

22       66.    The Dental Monitoring platform matches the corresponding regions of the initial

23   computer model and new computer model using the identified reference points. For example, the

24   '321 patent explains "[a]lgorithms for comparison between two three-dimensional models" in

25   which "[a] three-dimensional target model is [] compared to a three-dimensional updated model,

26   for example obtained by 3D extrapolation of 2D representations." ('321 patent at 7:34-42.) The

27   comparison is carried out "automatically or semi-automatically using…3D best-fit algorithms or

28   manually using 3D alignment tools, especially by selecting, on each of the models, three points

corresponding to identical sites." *Id*. The '688 patent also explains that "the final reference model, resulting from the optimization by movement of the tooth models, is compared with the initial reference model" and that the comparison "makes it possible to observe the differences between the positioning of the teeth in the…initial reference model…and during the acquisition of the updated image." ('688 patent at 29:50-59.) Specifically, "[t]he comparison of the initial and updated reference models comprises the comparison of the spatial coordinates of the points of the surfaces defined by these two reference models" and makes it possible "to deduce therefrom any modifications of shape" between the models. (*Id*. at 33:5-9.)

67.    The Dental Monitoring platform also matches the initial computer model and new computer model as a whole using the previously matched regions. For example, the Dental Monitoring platform performs "best-fit" algorithms for matching the computer models as a whole. (*See, e.g.*, '321 patent at 7:34-42.) DM's system also performs "3D matching," which involves "superimpos[ing] the teeth of each of the 3D models calculated on previous dates." Ex. 25 at 8.

68.    The Dental Monitoring platform compares the initial reference model and the updated model to calculate the differences in teeth positions between the models. For example, the '688 patent explains that "the final reference model, resulting from the optimization by movement of the tooth models, is compared with the initial reference model" and that the comparison "makes it possible to observe the differences between the positioning of the teeth in the…initial reference model…and during the acquisition of the updated image." ('688 patent at 29:50-59.) Specifically, "[t]he comparison of the initial and updated reference models comprises the comparison of the spatial coordinates of the points of the surfaces defined by these two reference models" and makes it possible "to deduce therefrom any modifications of shape" between the models. (*Id*. at 33:5-9.) The measurement of the movements is "established very precisely, 0.05 mm on the anterior teeth and 0.07 mm on the posterior teeth." Ex. 25 at 6.

69.    The calculation of positional differences in the patient's teeth between the compared models is also shown by the Dental Monitoring platform's display of the calculated position differences on the user interface. For example, the orthodontist's interface provides "multiple tools to assess tooth movement" including an "activity graph (Figure 1) [that] gives an overall graphic

-44-

visualization of tooth movement per arch." Ex. 24 at 3. The interface further shows "[a] separate graph [that] quantifies the movements of individual teeth (Figure 2)" by "[s]ix linear and angular measurements…: mesial/distal translation, extrusion/intrusion, buccal/lingual translation, buccal/lingual torque, rotation, and mesial/distal angulation." (*Id.*). The monitored patients' results regarding the "measurement of the movements" of the teeth are "published to the dashboard via an online platform (Figs. 3, 4)." Ex. 25 at 6-7.



**Figure 1. Treatment activity graph.** This graph measures the movement of the maxillary (blue) and mandibular (gray) teeth for sixteen intervals over seven month.

(*See, e.g.*, Ex. 24 at FIG. 1.)



**Figure 2. Individual tooth movement table.** These tables show movements for an individual tooth. Linear measurements are given for mesial/distal translation, extrusion/intrusion, and buccal/lingual translation. Angular measurements are given for buccal/lingual torque, rotation, and mesial/distal angulation.

(*See, e.g.*, *id.* at FIG. 2.)



*Figure 3*
*Results on the dashboard.*

*Figure 4*
*Web service with a list of patients being monitored.*

(*See, e.g.*, Ex. 25 at FIGs. 3-4.)

### 3.    Engage and SmileMate Platforms

70.    Dental Monitoring's Engage platform includes software that "provide[s] patients with an ultra-realistic preview of their smile during and after orthodontic and

1    whitening    treatment    —    with    images    taken    from    their    smartphone."

2    (https://dentalmonitoring.com/engage/, a true and correct copy of which is attached hereto as

3    Exhibit 28.)  On information and belief, Dental Monitoring's SmileMate platform including Vision

4    technology  (*See*  Dental  Monitoring  website,  Internet  Archive  (Mar.  30,  2023),

5    https://web.archive.org/web/20230330151643/https://dental-monitoring.com/smilemate/, a true

6    and correct copy of which is attached hereto as Exhibit 29, as accessed by the Internet Archive on

7    March, 30, 2023; https://dentalmonitoring.com/, a true and correct copy of which is attached hereto

8    as  Exhibit  30  ("Smilemate  and  Vision  are  products  designed  and  manufactured  by  Dental

9    Monitoring SAS")) was the predecessor to the Engage platform and provided functionality that is

10   substantively similar to that provided by the Engage platform.

**Top feature**

# The best kept secret of this process?

You can provide patients with an ultra-realistic preview of their smile during and after orthodontic and whitening treatment — with images taken from their smartphone. So you can rally their interest before they ever step foot in your office.

  

Learn how Engage can help you boost case acceptance

(Ex. 28.)

**Top feature**

# The best kept secret of this process?

You can provide patients with an ultra-realistic preview of their smile during and after orthodontic and whitening treatment — with images taken from their smartphone. So you can rally their interest before they ever step foot in your office.

  

Learn how SmileMate can help you boost case acceptance

(Ex. 29.)

71.    On information and belief, Dental Monitoring's patents or patent publications, including U.S. Patent Publication No. 2021/0267716 ("'716 publication") describe the functionality of the Engage platform.  The '716 publication, titled "Method for Simulating a Dental Situation," describes the need for a way to help a patient decide whether they will pursue orthodontic treatment in light of how wearing an orthodontic appliance can change the appearance of the patient.  (*See* '716 publication at [0002]-[0003].)   The '716 publication describes a solution that involves simulation of what an orthodontic appliance will look like when worn to show a patient before orthodontic treatment.  (*Id.* at [0001].)  A true and correct copy of the '716 publication is attached hereto as Exhibit 31.  Dental Monitoring's Engage attempts to solve the same problem using the same solution.  (*See* Ex. 28 ("You can provide patients with an ultra-realistic preview of their smile during and after orthodontic and whitening treatment — with images taken from their smartphone. So you can rally their interest before they ever step foot in your office.").)

72.    The Engage platform captures an image(s) of the patient's teeth (e.g., using a camera or 3D scanner).  For example, the '716 publication describes that "[p]referably, the original photo is acquired by the patient, preferably without using a holder to immobilize the camera, and

1   especially without a tripod." ('716 publication at [0076]-[0077].) The original model "may be

2   prepared from measurements made on the teeth of the patient or on a cast of their teeth, a plaster

3   cast" or "preferably created with a 3D scanner." (*Id.* at [0079].)

4       73.    The Engage platform can perform its analysis on images of the patient's face, rather

5   than images of just their teeth. (*See, e.g.*, Ex. 28.)






(*Id.*)

18      74.    The Engage platform builds a model, defined as "a digital three-dimensional

19  model." ('716 publication at [0050].) The model is generated based on an image(s) of the patient's

20  teeth captured (e.g., using a 3D scanner). (*Id.* at [0079].) The platform "enables reconstruction of

21  three-dimensional (3D) digital models from these intraoral images by stitching them with the

22  pretreatment CBCT and intraoral scan files for more accurate AI monitoring and 3D evaluation of

23  tooth movements (including root movements)." Park, et. al., *Teledentistry platforms for*

24  *Orthodontics,"* J. Clinical Pediatric Dentistry, Vol. 45, 50 (Feb. 2021), a true and correct copy of

25  which is attached hereto as Exhibit 32. On information and belief, the model is a "parametric 3D

26  model including case-specific parameters for the shape of at least one of the patient's teeth." For

27  example, the platform "generates state-of-the-art simulation of post-treatment smiles, using the

28

actual details of the patient's teeth and gums." *Smile Doctors and Dental Monitoring Expand and Accelerate Partnership to Provide Remote Monitoring to All Patients During the State of Emergency*," Business Wire India (Mar. 21, 2020), a true and correct copy of which is attached hereto as Exhibit 33; *see also* "*Boost Case Acceptance by Dr Scriven*", DentalMonitoring Video, (June 30, 2020), available at: https://www.youtube.com/watch?v=PN2c71yVIE0&t=62s ("The good thing about Vision is that it actually uses [the patients'] teeth to create the result, so I think it's much more realistic and much more likely to resonate with the patient.").)

75.     The Engage platform simulates a "[f]uture [d]ental [s]ituation" of a dental arch ('716 publication at [0137]-[0138]), corresponding to the claimed "final orthodontic position of the patient's teeth." The 3D model of the patient's arch is to simulate the patient's teeth positions at a subsequent time after dental treatment, which corresponds to "rendering the 3D model with the patient's teeth in a predetermined position." For example, the Engage platform "deform[s] the original model to simulate the effect of time between the current time and a simulation time prior or subsequent to the current time, for example by more than 1 week, 1 month or 6 months." (*Id.* at [0141].) In particular, the deformation may "simulate the effect of an orthodontic treatment or the progress of a relapse, or an aesthetic treatment," such as "two teeth separating or two teeth moving closer together, a deformation of a tooth model, for example to simulate bruxism, a deletion of a tooth model, and/or a deformation of a jaw model." (*Id.* at [0083]-[0088].)

76.     The Engage platform creates a "hyperrealistic original view," (*id.* at [0143]), corresponding to "rendering" of "a second 2D image," of the patient's simulated dental arch after treatment, corresponding to "the patient's teeth in the final orthodontic position." The "hyperrealistic original view is acquired by carrying out the following steps: a1) at a current time, generating an original model of a dental arch of the patient; a2) deforming the original model to simulate the effect of time between the current time and a simulation time prior or subsequent to the current time, for example by more than 1 week, 1 month or 6 months; a3) acquiring an original view of the original model deformed in the previous step; a4) converting the original view acquired in the previous step into a hyperrealistic original view, preferably by carrying out steps i) to iii)." (*Id.* at [0139]-[0143].) The hyperrealistic original view "provides substantially the same

1  information as photos, without having to take photos" and "may therefore also be qualified

2  'photorealistic.'" (*Id.* at [0098].)

3  **FIRST COUNTERCLAIM**

4  **(Declaratory Judgment of Noninfringement of U.S. Patent No. 10,755,409)**

5  77.  Align incorporates by reference the allegations set forth in paragraphs 1-76 as

6  through fully set forth herein.  Align further incorporates by reference its First Defense to Dental

7  Monitoring's Complaint.

8  78.  An actual controversy exists between Align and Dental Monitoring over the alleged

9  infringement of the asserted claims of the '409 patent.  Dental Monitoring holds itself out as the

10  owner of all legal rights, title and interests in the '409 patent, including the right to enforce the '409

11  patent.  Dental Monitoring has filed suit against Align alleging that Align has infringed the '409

12  patent in violation of at least 35 U.S.C. § 271(a).

13  79.  Align hereby seeks a declaration that it has not infringed any valid claim of the '409

14  patent.  None of Align's products, including, inter alia, Align's Invisalign system, Invisalign Virtual

15  Care, and Invisalign Virtual Care AI, have infringed, or are infringing, any valid, enforceable, and

16  properly construed claim of the '409 patent in violation of 35 U.S.C. § 271.

17  80.  A definite and concrete, real and substantial, justiciable controversy exists between

18  Align and Dental Monitoring concerning Align's non-infringement of the '409 patent, which is of

19  sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

20  81.  Align is entitled to a declaratory judgment that its products have not infringed any

21  valid, enforceable, and properly construed claim of the '409 patent.

22  **SECOND COUNTERCLAIM**

23  **(Declaratory Judgment of Noninfringement of U.S. Patent No. 11,049,248)**

24  82.  Align incorporates by reference the allegations set forth in paragraphs 1-81 as

25  through fully set forth herein.  Align further incorporates by reference its Second Defense to Dental

26  Monitoring's Complaint.

27  83.  An actual controversy exists between Align and Dental Monitoring over the alleged

28  infringement of the asserted claims of the '248 patent.  Dental Monitoring holds itself out as the

1    owner of all legal rights, title and interests in the '248 patent, including the right to enforce the '248

2    patent.  Dental Monitoring has filed suit against Align alleging that Align has infringed the '248

3    patent in violation of at least 35 U.S.C. § 271(a).

4         84.    Align hereby seeks a declaration that it has not infringed any valid, enforceable, and

5    properly construed claim of the '248 patent.  None of Align's products, including, inter alia, Align's

6    Invisalign system, Invisalign Virtual Care, and Invisalign Virtual Care AI, have infringed, or are

7    infringing, any valid, enforceable, and properly construed claim of the '248 patent in violation of

8    35 U.S.C. § 271.

9         85.    A definite and concrete, real and substantial, justiciable controversy exists between

10   Align and Dental Monitoring concerning Align's non-infringement of the '248 patent, which is of

11   sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

12        86.    Align is entitled to a declaratory judgment that its products have not infringed any

13   valid, enforceable, and properly construed claim of the '248 patent.

## THIRD COUNTERCLAIM

### (Declaratory Judgment of Noninfringement of U.S. Patent No. 11,109,945)

16        87.    Align incorporates by reference the allegations set forth in paragraphs 1-86 as

17   through fully set forth herein.  Align further incorporates by reference its Third Defense to Dental

18   Monitoring's Complaint.

19        88.    An actual controversy exists between Align and Dental Monitoring over the alleged

20   infringement of the asserted claims of the '945 patent.  Dental Monitoring holds itself out as the

21   owner of all legal rights, title and interests in the '945 patent, including the right to enforce the '945

22   patent.  Dental Monitoring has filed suit against Align alleging that Align has infringed the '945

23   patent in violation of at least 35 U.S.C. § 271(a).

24        89.    Align hereby seeks a declaration that it has not infringed any valid, enforceable, and

25   properly construed claim of the '945 patent.  None of Align's products, including, *inter alia*,

26   Align's Invisalign system, Invisalign Virtual Care, and Invisalign Virtual Care AI, have infringed,

27   or are infringing, any valid, enforceable, and properly construed claim of the '945 patent in

28   violation of 35 U.S.C. § 271.

1    90.    A definite and concrete, real and substantial, justiciable controversy exists between

2    Align and Dental Monitoring concerning Align's non-infringement of the '945 patent, which is of

3    sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

4    91.    Align is entitled to a declaratory judgment that its products have not infringed any

5    valid, enforceable, and properly construed claim of the '945 patent.

6    **FOURTH COUNTERCLAIM**

7    **(Declaratory Judgment of Invalidity of U.S. Patent No. 10,755,409)**

8    92.    Align incorporates by reference the allegations set forth in paragraphs 1-91 as

9    through fully set forth herein.  Align further incorporates by reference its Fourth Defense to Dental

10   Monitoring's Complaint.

11   93.    Dental Monitoring has filed suit against Align alleging infringement of the '409

12   patent under at least 35 U.S.C. § 271(a).

13   94.    A definite and concrete, real and substantial, justiciable controversy exists between

14   Align and Dental Monitoring concerning between Align and Dental Monitoring regarding whether

15   the claims of the '409 patent are invalid.

16   95.    Align is entitled to a declaration that all asserted claims of the '409 patent are invalid

17   because they fail to comply with one or more requirements under the statutory provisions of Title

18   35 of the United States Code, including without limitation, one or more requirements of sections

19   35 U.S.C. §§ 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

20   96.    Align hereby seeks a declaration that all asserted claims of the '409 patent are

21   invalid.

22   **FIFTH COUNTERCLAIM**

23   **(Declaratory Judgment of Invalidity of U.S. Patent No. 11,049,248)**

24   97.    Align incorporates by reference the allegations set forth in paragraphs 1-96 as

25   through fully set forth herein.  Align further incorporates by reference its Fifth Defense to Dental

26   Monitoring's Complaint.

27   98.    Dental Monitoring has filed suit against Align alleging infringement of the '248

28   patent under at least 35 U.S.C. § 271(a).

-53-

99.     A definite and concrete, real and substantial, justiciable controversy exists between Align and Dental Monitoring concerning whether the claims of the '248 patent are invalid.

100.     Align is entitled to a declaration that all asserted claims of the '248 patent are invalid because they fail to comply with one or more requirements under the statutory provisions of Title 35 of the United States Code, including without limitation sections 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

101.     Align hereby seeks a declaration that all asserted claims of the '248 patent are invalid.

### SIXTH COUNTERCLAIM

### (Declaratory Judgment of Invalidity of U.S. Patent No. 11,109,945)

102.     Align incorporates by reference the allegations set forth in paragraphs 1-101 as through fully set forth herein.  Align further incorporates by reference its Sixth Defense to Dental Monitoring's Complaint.

103.     Dental Monitoring has filed suit against Align alleging infringement of the '945 patent under at least 35 U.S.C. § 271(a).

104.     A definite and concrete, real and substantial, justiciable controversy exists between Align and Dental Monitoring concerning whether the claims of the '945 patent are invalid.

105.     Align is entitled to a declaration that all asserted claims of the '945 patent are invalid because they fail to comply with one or more requirements under the statutory provisions of Title 35 of the United States Code, including without limitation sections 101, 102, 103, and/or 112, or other judicially created bases for invalidity.

106.     Align hereby seeks a declaration that all asserted claims of the '945 patent are invalid.

### SEVENTH COUNTERCLAIM

### (Infringement of U.S. Patent No. 7,156,661)

107.     Align incorporates by reference the allegations set forth in paragraphs 1-106 as through fully set forth herein.

108.    On information and belief, Dental Monitoring's devices and services—including a platform comprising a patient-facing DentalMonitoring mobile app, a tooth movement tracking algorithm, and an online Doctor Dashboard (collectively the "'661 Accused Products and Services")—met all claim limitations of at least claim 1 of the '661 patent before that patent expired.  The '661 Accused Products and Services are non-limiting examples identified based on publicly available information.  Align reserves the right to identify additional infringing activities, products, and services on the basis of information obtained, for example, during discovery.

109.    Dental Monitoring directly infringed the '661 patent, literally under 35 U.S.C. § 271(a), and/or under the doctrine of equivalents, by, for example, performing the claimed method of the '661 patent using the '661 Accused Products and Services.

110.    On information and belief, Dental Monitoring's '661 Accused Products and Services practiced claim 1 of the '661 patent, as evidenced by, for example, Dental Monitoring's patents and publications that describe the design and operation of the '661 Accused Products and Services.  Dental Monitoring's patents or publications, including the '321 patent and '688 patent, referenced herein have been listed on Dental Monitoring's website as granted patents "on [Dental Monitoring's] technology and hardware."  (*See* Ex. 21.)

111.    By way of illustration only, the '661 Accused Products and Services performed "[a] method for matching computer models of a jaw."  For example, the Dental Monitoring platform matched computer models of the patient's jaw with a preceding computer model of the patient's jaw.  (*Supra* ¶¶ 59-60; *see also* Ex. 19 at 420-21.)  The Dental Monitoring platform used the tooth movement tracking algorithm to calculate movements of teeth positions based on the computer models.  (*Supra* ¶ 61; *see also* Ex. 19 at 420-21.)

112.    The '661 Accused Products and Services performed "loading a first computer model of a jaw having teeth in initial positions."  For example, Dental Monitoring's online Doctor Dashboard would receive an initial 3D model and load it into Dental Monitoring's platform for matching computer models, which corresponded to "loading a first computer model of a jaw."  The initial 3D model was used to "establish" or "calculate" a "baseline" of tooth positions, which corresponded to "having teeth in initial positions."  (*Supra* ¶ 62; *see also* Ex. 19 at 421; *see also*

1    Ex. 24 at 2.)  The 3D model was of the "patients' arches," which corresponded to the jaw.  (Ex.

2    25.)

3    113.    The '661 Accused Products and Services performed "loading a second computer

4    model of the jaw, wherein positions of at least some of the teeth in the second computer model are

5    different than the initial positions."  For example, Dental Monitoring's online Doctor Dashboard

6    would receive a "next" or "new" 3D model based on a "preceding" or "latest" 3D model (*e.g.*, the

7    initial model).  (*Supra* ¶ 63; *see also* Ex. 19 at 421; *see also* Ex. 26 at 59; *see also* Ex. 27 at 725.)

8    The online Doctor Dashboard then loaded the next or new 3D model into Dental Monitoring's

9    platform for matching computer models, which corresponded to "loading a second computer model

10    of a jaw."  The positions of some teeth in the "next" or "new" 3D model and in the "preceding" or

11    "latest" 3D model were different because the new 3D model "served as the basis for tooth-

12    movement calculations."  (*Id*.)    The new 3D model was of the patients' "arches," which

13    corresponded to the jaw.  (Ex. 25 at 6.)

14    114.    The '661 Accused Products and Services performed "identifying at least one

15    reference point on a region of the first computer model."  For example, Dental Monitoring's

16    platform comparison of the computer models involved "selecting, on each of the models, three

17    points corresponding to identical sites" ('321 patent at 7:41-42) or "comparison of the spatial

18    coordinates of the points of the surfaces defined by these two reference models."  ('688 patent at

19    33:5-8.)  Any of these "three points" or "spatial coordinates" corresponded to the "at least one

20    reference point."  (*Supra* ¶ 64.)  The region comprised "a portion of the jaw other than the teeth."

21    (*Supra* ¶ 65.)

22    115.    The '661 Accused Products and Services performed "identifying a corresponding

23    reference point on a corresponding region of the second computer model for each point identified

24    on the first model."  For example, Dental Monitoring's platform comparison of the computer

25    models involved "selecting, on each of the models, three points corresponding to identical sites"

26    ('321 patent at 7:41-42) or "comparison of the spatial coordinates of the points of the surfaces

27    defined by these two reference models."  ('688 patent at 33:5-8.)  Any of these "three points" or

28

1    "spatial coordinates" were the "corresponding reference point on a corresponding region."  (*Supra*

2    ¶ 64.)

3    116.    On information and belief, the '661 Accused Products and Services performed

4    "matching the region of the first computer model with the corresponding region of the second

5    computer model, using the identified reference points.  (*Supra* ¶ 66.)

6    117.    The '661 Accused Products and Services performed "matching the first and second

7    computer models as a whole, using the matched regions."  For example, Dental Monitoring's

8    platform performed "best-fit" algorithms for matching the computer models as a whole.  (*See, e.g.*,

9    '321 patent at 7:34-42.)    DM's system also performed "3D matching" that involved

10   "superimpos[ing] the teeth of each of the 3D models calculated on previous dates."  (Ex. 25 at 8;

11   *see also supra* ¶ 67.)

12   118.    The '661 Accused Products and Services performed "calculating positional

13   differences between the teeth in their initial positions and the teeth in their positions in the second

14   computer model, using the matched regions as non-moving reference regions."  For example, the

15   Dental Monitoring platform compared the initial reference model and the updated model to

16   calculate the differences in teeth positions between the models.  (*Supra* ¶ 68; *see also* Ex. 25 at 6.)

17   The Dental Monitoring platform displayed the results of calculated positional differences in the

18   patient's teeth between the compared models.  (*Supra* ¶ 69; *see also* Ex. 24 at 3, FIGs. 1-2; *see also*

19   Ex. 25 at 6-7, FIGs. 3-4.)

20                    **EIGHTH COUNTERCLAIM**

21              **(Infringement of U.S. Patent No. 10,945,813)**

22   119.    Align incorporates by reference the allegations set forth in paragraphs 1-118 as

23   through fully set forth herein.

24   120.    On information and belief, Dental Monitoring's Engage Platform (Ex. 28) and its

25   predecessor, the SmileMate platform including Vision technology (Ex. 29; Ex. 30 ("Smilemate and

26   Vision are products designed and manufactured by Dental Monitoring SAS")), and any associated

27   software (collectively the "'813 Accused Products and Services"), meets all claim limitations of at

28   least claim 1 of the '813 patent.  The '813 Accused Products and Services are non-limiting examples

1  identified based on publicly available information.  Align reserves the right to identify additional

2  infringing activities, products, and services on the basis of information obtained, for example,

3  during discovery.

4          121.    Dental Monitoring has directly infringed the '813 patent, literally under 35 U.S.C.

5  § 271(a), and/or under the doctrine of equivalents, by practicing the patented method and by

6  making, using, selling, offering for sale, and/or importing into the United States, without authority,

7  the '813 Accused Products and Services.

8          122.    The '813 Accused Products and Services practice "[a] computer-implemented

9  method of simulating orthodontic treatment."  For example, the Engage platform performs a

10  method for simulating a "[f]uture [d]ental [s]ituation" of a dental arch, "whether within the context

11  of a therapeutic treatment or not." ('716 publication at [0137]-[0138]; *see also supra* ¶¶ 70-71.)

12          123.    The '813 Accused Products and Services practice "capturing a first 2D image of a

13  patient's face, including their teeth." (*Supra* ¶ 72.)  According to Dental Monitoring's website (Ex.

14  28), the Engage platform can perform analysis on images of the patient's face, rather than images

15  of just their teeth.  (*Supra* ¶ 73; *see also* Ex. 28.)

16          124.    The '813 Accused Products and Services practice "building a parametric 3D model

17  of the patient's teeth based on the 2D image."  For example, the Engage platform builds a model,

18  defined as "a digital three-dimensional model" based on an image(s) of the patient's teeth captured

19  (e.g., using a 3D scanner). (*Supra* ¶ 74; *see also* Ex. 32 at 50; see also Ex. 33.)  On information

20  and belief, the model is a "parametric 3D model including case-specific parameters for the shape

21  of at least one of the patient's teeth." (*Id*.)

22          125.    The '813 Accused Products and Services practice "simulating a final orthodontic

23  position of the patient's teeth by rendering the 3D model with the patient's teeth in a predetermined

24  position."  For example, the Engage platform "deform[s]" (*id.* at [0141]) the 3D model of the

25  patient's arch to simulate the patient's teeth positions at a subsequent time after dental treatment,

26  which corresponds to "rendering the 3D model with the patient's teeth in a predetermined position."

27  (*Supra* ¶ 75.)

28

126.    The '813 Accused Products and Services practice "rendering a second 2D image of the patient's face with teeth in the final orthodontic position."  For example, the Engage platform creates a "hyperrealistic original view," (*id.* at [0143]), corresponding to "rendering" of "a second 2D image," of the patient's simulated dental arch after treatment, corresponding to "the patient's…teeth in the final orthodontic position." (*Supra* ¶ 76.)  According to Dental Monitoring's website (Ex. 28), the Engage platform can perform analysis on images of the patient's face, rather than images of just their teeth.  (*Supra* ¶ 73; *see also* Ex. 28.)

127.    Dental Monitoring has actively induced infringement of the '813 patent under 35 U.S.C. § 271(b).  Dental Monitoring possesses knowledge of and is aware of the '813 patent by virtue of, at a minimum, Align's notice letter sent to Dental Monitoring's counsel on July 13, 2023, a true and correct copy of which is attached hereto as Exhibit 34, and the filing of these Counterclaims.  Dental Monitoring induces, with specific intent, infringement of the '813 patent by its customers.  Dental Monitoring encourages and facilitates infringing uses of the Accused Products through the creation and dissemination of promotional and marketing materials, instructional materials, product manuals, and/or technical materials to its customers.

128.    Dental Monitoring also has been and is contributing to the infringement of one or more claims of the '813 patent, either literally or under the doctrine of equivalents.

129.    Dental Monitoring has actively, knowingly, and intentionally contributed and continues to actively, knowingly, and intentionally contribute to the infringement of the '813 patent by selling or offering to sell the '813 Accused Products and Services within the United States and/or by importing the '813 Accused Products and Services into the United States, with knowledge that the infringing technology in the '813 Accused Products and Services is especially made and/or especially adapted for use in infringement of the '813 patent.

130.    Dental Monitoring has contributed to the infringement by others with knowledge that the infringing technologies in the '813 Accused Products and Services are material parts of the patented invention, and with knowledge that the infringing technologies in the '813 Accused Products and Services are not staple articles of commerce suitable for substantial non-infringing use, and with knowledge that others including, but not limited to, resellers, distributors, customers,

1  dentists, orthodontists, dental and orthodontic labs, and/or other end users of the '813 Accused

2  Products and Services infringe and will continue to infringe the '813 patent because the '813

3  Accused Products and Services do not have any substantial non-infringing uses.  Dental Monitoring

4  has such knowledge at least because the claimed features of the '813 patent are used by others

5  including, but not limited to, resellers, distributors, customers, dentists, orthodontists, dental and

6  orthodontic labs, and/or other end users of the '813 Accused Products and Services.

7       131.    Dental Monitoring has willfully infringed the '813 patent.  On information and

8  belief, despite knowing that its actions constituted infringement of the '813 patent and/or despite

9  knowing that that there was a high likelihood that its actions constituted infringement of the patent,

10  Dental Monitoring nevertheless continued its infringing actions, and continues to make, use and

11  sell its infringing products.

12       132.    Dental Monitoring's acts of infringement have injured and will continue to injure

13  Align in a manner for which monetary damages are inadequate.

14       133.    Dental Monitoring's wrongful conduct has caused Align to suffer irreparable harm

15  resulting from the loss of its lawful patent rights to exclude others from making, using, selling,

16  offering to sell, and importing the patented inventions.  Upon information and belief, Dental

17  Monitoring will continue these infringing acts unless enjoined by this Court.

## NINTH COUNTERCLAIM

### (Infringement of U.S. Patent No. 11,589,743)

20       134.    Align incorporates by reference the allegations set forth in paragraphs 1-133 as

21  though fully set forth herein.

22       135.    On information and belief, Dental Monitoring's devices and services—such as the

23  ScanBox, ScanBox pro, DentalMonitoring application, along with any other associated software

24  (collectively the "'743 Accused Products and Services")—meet all claim limitations of at least

25  claim 1 of the '743 patent.  On information and belief, the functionality of the ScanBox pro with

26  respect to the features of claim 1 are also applicable to the ScanBox.  (*See, e.g.*, Ex. 18 ("The

27  ScanBox pro takes the utility of the original DM ScanBox and streamlines its design, improves the

28  quality of images captured, and creates more consistent scans.").)  The '743 Accused Products and

Services are non-limiting examples identified based on publicly available information. Align reserves the right to identify additional infringing activities, products, and services on the basis of information obtained, for example, during discovery.

136. Dental Monitoring has directly infringed the '743 patent, literally under 35 U.S.C. § 271(a), and/or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States, without authority, the '743 Accused Products and Services that contain the system disclosed in the '743 patent.

137. By way of illustration only, the '743 Accused Products and Services provide "[a] system for tracking a progress of an orthodontic procedure for repositioning misaligned teeth of a patient." As shown on Dental Monitoring's website, the ScanBox pro used with the DentalMonitoring application allows a practitioner to "track[] a progress of an orthodontic procedure for repositioning misaligned teeth of a patient." (*See, e.g.*, Ex. 17.)

138. The '743 Accused Products and Services further provide "a mobile device holder comprising a base and adjustable stops configured to provide a compressive force on a mobile device of a patient." The phone support of Dental Monitoring's ScanBox pro is "a mobile device holder." (*Supra* ¶¶ 40-42, 45; *see also* Ex. 17.) The phone support includes "a base and two adjustable stops" that can be adjusted to reduce the distance between the stops to fit around a patient's mobile device. (*Id.*) The adjustable stops provide a compressive force on the mobile device to assist in preventing movement of the mobile device. (*Id.*)

139. The '743 Accused Products and Services further provide "a cheek retractor configured to attach with the mobile device holder." For example, Dental Monitoring's ScanBox pro includes a "Cheek Retractor Tube" configured to attach with the "phone support." (*Supra* ¶¶ 43-45; *see also* Ex. 17.)

140. The '743 Accused Products and Services further provide "executable instructions" that are designed to be stored in "a non-transitory computing device readable medium" and that are "executed by a processor to cause a mobile device to perform a method." For example, Dental Monitoring's ScanBox pro and DentalMonitoring app are configured to be used with any "recent smartphone." (*Supra* ¶¶ 46-47; *see also* Ex. 17.) On information and belief, the Dental Monitoring

-61-

app runs on the smartphone and provides instructions to the smartphone, such that the instructions are stored in a non-transitory computing device readable medium and are executed by a processor to cause the smartphone to perform method.

141.    The instructions provided by the '743 Accused Products and Services comprise "providing, via the mobile device, a user interface."  For example, the DentalMonitoring app runs on the smartphone and displays an interactive user interface via the display of the smartphone. (*Supra* ¶¶ 47-48; *see also* Ex. 17.)

142.    The instructions provided by the '743 Accused Products and Services comprise "instructing, with preparation instructions via the provided user interface, the patient to place the mobile device in the mobile device holder."  For example, the DentalMonitoring app runs on the smartphone and displays the text "Place the phone into the phone support and latch it in." (*Supra* ¶ 49.)

143.    The instructions provided by the '743 Accused Products and Services comprise "instructing, via the provided user interface, the patient move the mobile device holder relative to the teeth of the patient while the cheek retractor holds away a cheek of the patient to expose teeth of the patient, while taking a photograph and/or video of the exposed teeth using a camera of the mobile device, the user interface instructing the patient using video and/or audio instructions."  For example, the Dental Monitoring app displays by video the text "Connect the Cheek Retractor Tube to the Phone Support and insert the Cheek Retractor Tube into your mouth." (*Id*.)  Once the Cheek Retractor Tube is in the patient's mouth, the Dental Monitoring app displays by video moving arrows and progress bars that instruct the patient to move the phone support in certain directions relative to the teeth while the Cheek Retractor Tube is in position.  (*Supra* ¶ 50; *see also* Ex. 17.)

144.    The retractor tube positions the smartphone camera to take photographs or videos of the patient's teeth when the patient has the Cheek Tractor Tube inserted in their mouth.  (*Supra* ¶ 51.)

145.    The instructions provided by the '743 Accused Products and Services comprise "receiving an input from the camera of the mobile device."  As described above, the Dental Monitoring app takes photographs or videos using the smartphone camera.  (*Supra* ¶¶ 50-52; *see*

1    *also* Ex. 17; *see also* Ex. 19 at 422.)  The DentalMonitoring application running on the smartphone

2    thus receives an input, such as an indication that a photo or video was captured, from the

3    smartphone's camera.

4    146.    The instructions provided by the '743 Accused Products and Services comprise

5    "providing feedback to the patient on capturing the photograph and/or video using the mobile

6    device."  For example, upon capture of the photographs and/or videos of the patient's teeth, the

7    DentalMonitoring app displays an indicator (e.g., a check mark) indicating that a photograph and/or

8    video was successfully captured.  (*Supra* ¶ 53.)

9    147.    The instructions provided by the '743 Accused Products and Services provide

10   additional examples of feedback.  Once the photographs and/or videos of the patient's teeth are

11   captured, the Dental Monitoring app displays feedback to help the patient "to ensure [the patient

12   has] scanned correctly." (*Supra* ¶ 54.)

13   148.    The instructions provided by the '743 Accused Products and Services comprise

14   "storing the captured photographs and/or videos of the teeth of the patient."  As described above,

15   the Dental Monitoring app takes photographs or videos using the smartphone's camera.  (*Supra* ¶¶

16   50-52; *see also* Ex. 17; *see also* Ex. 19 at 422.)  Once the photographs or video of the patient's

17   teeth are captured, the DentalMonitoring app allows the patient to review the captured photographs

18   and/or videos before sending them to a doctor.  (*Supra* ¶ 55.)  Thus, the smartphone running the

19   DentalMonitoring app stores the captured photographs and/or videos.

20   149.    The instructions provided by the '743 Accused Products and Services comprise

21   "transmitting the captured photograph and/or video of the teeth of the patient for tracking the

22   progress of the orthodontic procedure of the patient by a treatment professional without the patient

23   having to visit the treatment professional."  For example, the DentalMonitoring app transmits and

24   uploads the captured photographs or videos of the patient's teeth to send to a professional (e.g.,

25   dental or orthodontic practitioner) for review. (*Supra* ¶ 56; *see also* Ex. 20.)

26   150.    Dental Monitoring has actively induced infringement of the '743 patent under 35

27   U.S.C. § 271(b).  Dental Monitoring possesses knowledge of and is aware of the '743 patent by

28   virtue of, at a minimum, Align's notice letter sent to Dental Monitoring's counsel on July 13, 2023

and the filing of these Counterclaims.  *See* Ex. 34.  Dental Monitoring induces, with specific intent, infringement of the '743 patent by its customers.  Dental Monitoring encourages and facilitates infringing uses of the Accused Products through the creation and dissemination of promotional and marketing materials, instructional materials, product manuals, and/or technical materials to its customers.

151.    Dental Monitoring also has been and is contributing to the infringement of one or more claims of the '743 patent, either literally or under the doctrine of equivalents.

152.    Dental Monitoring has actively, knowingly, and intentionally contributed and continues to actively, knowingly, and intentionally contribute to the infringement of the '743 patent by selling or offering to sell the '743 Accused Products and Services within the United States and/or by importing the '743 Accused Products and Services into the United States, with knowledge that the infringing technology in the '743 Accused Products and Services is especially made and/or especially adapted for use in infringement of the '743 patent.

153.    Dental Monitoring has contributed to the infringement by others with knowledge that the infringing technologies in the '743 Accused Products and Services are material parts of the patented invention, and with knowledge that the infringing technologies in the '743 Accused Products and Services are not staple articles of commerce suitable for substantial non-infringing use, and with knowledge that others including, but not limited to, resellers, distributors, customers, dentists, orthodontists, dental and orthodontic labs, and/or other end users of the '743 Accused Products and Services infringe and will continue to infringe the '743 patent because the '743 Accused Products and Services do not have any substantial non-infringing uses.  Dental Monitoring has such knowledge at least because the claimed features of the '743 patent are used by others including, but not limited to, resellers, distributors, customers, dentists, orthodontists, dental and orthodontic labs, and/or other end users of the '743 Accused Products and Services.

154.    Dental Monitoring has willfully infringed the '743 patent.  On information and belief, despite knowing that its actions constituted infringement of the '743 patent and/or despite knowing that that there was a high likelihood that its actions constituted infringement of the patent,

1    Dental Monitoring nevertheless continued its infringing actions, and continues to make, use and

2    sell its infringing products.

3        155.    Dental Monitoring's acts of infringement have injured and will continue to injure

4    Align in a manner for which monetary damages are inadequate.

5        156.    Dental Monitoring's wrongful conduct has caused Align to suffer irreparable harm

6    resulting from the loss of its lawful patent rights to exclude others from making, using, selling,

7    offering to sell, and importing the patented inventions.  Upon information and belief, Dental

8    Monitoring will continue these infringing acts unless enjoined by this Court.

9                    **TENTH COUNTERCLAIM**

10                **(Infringement of U.S. Patent No. 11,589,957)**

11        157.    Align incorporates by reference the allegations set forth in paragraphs 1-156 as

12    through fully set forth herein.

13        158.    On information and belief, Dental Monitoring's devices and services, such as the

14    ScanBox, ScanBox pro, DentalMonitoring application, along with any other associated software

15    (collectively the "'957 Accused Products and Services"), meets all claim limitations of at least

16    claim 1 of the '957 patent.  On information and belief, the functionality of the ScanBox pro with

17    respect to the features of claim 1 are also applicable to the ScanBox.  (*See, e.g.*, Ex. 18 ("The

18    ScanBox pro takes the utility of the original DM ScanBox and streamlines its design, improves the

19    quality of images captured, and creates more consistent scans.").)  The '957 Accused Products and

20    Services are non-limiting examples identified based on publicly available information.  Align

21    reserves the right to identify additional infringing activities, products, and services on the basis of

22    information obtained, for example, during discovery.

23        159.    Dental Monitoring has directly infringed the '957 patent, literally under 35 U.S.C.

24    § 271(a), and/or under the doctrine of equivalents, by making, using, selling, offering for sale,

25    and/or importing into the United States, without authority, the '957 Accused Products and Services

26    that contain the system disclosed in the '957 patent.

27        160.    By way of illustration only, the '957 Accused Products and Services provide

28    executable instructions" that are designed to be stored in "[a] non-transitory, computer-readable

storage media" and that are "executed by a processor of a mobile telecommunications device to cause the mobile telecommunications device having a camera to perform a method for capturing dental images for analysis." For example, Dental Monitoring's ScanBox pro and DentalMonitoring app are configured to be used with any "recent smartphone." (*Supra* ¶¶ 46-47; *see also* Ex. 17.) On information and belief, the DentalMonitoring app runs on the smartphone and provides instructions to the smartphone, such that the instructions are stored in a non-transitory computing device readable medium and are executed by a processor to cause the smartphone to perform "a method for capturing dental images for analysis."

161.    The instructions provided by the '957 Accused Products and Services comprise "guiding a patient to capture, with the camera of the mobile telecommunications device, a first predetermined set of images of teeth of the patient at specified viewing angles relative to the teeth using a first indicator that is output from the mobile telecommunications device, wherein the first indicator indicates to the patient that the patient should move the mobile telecommunications device relative to a mouth of the patient to the right/left with the jaws closed, in order to capture the first predetermined set of images of teeth at the specified viewing angles." For example, the DentalMonitoring app running on the smartphone instructs the patient through text on the display to "Connect the Cheek Retractor Tube to the Phone Support and insert the Cheek Retractor Tube into your mouth." (*Supra* ¶ 49.) Once the Cheek Retractor Tube is in the patient's mouth, the Dental Monitoring app displays by video a moving arrow and progress bar ("first indicator") that instruct the patient to move the phone support and connected smartphone in a left or right direction relative to the mouth of the patient while the Cheek Retractor Tube is in position and the patient's jaw is closed. (*Supra* ¶ 50.) The smartphone captures images of the patient's teeth at specified angles, indicated by the predetermined dots on the progress bar, as the patient moves the smartphone in the direction(s) indicated by the moving arrow and progress bar. (*Id*.)

162.    The instructions provided by the '957 Accused Products and Services comprise "guiding the patient to capture, with the camera of the mobile telecommunications device, a second predetermined set of images of teeth of the patient at specified viewing angles relative to the teeth using a second indicator output from the mobile telecommunications device, wherein the second

1  indicator indicates to the patient that the patient should move the mobile telecommunications device

2  relative to the mouth of the patient to the right/left with the jaws open, in order to capture the second

3  predetermined set of images of teeth at the specified viewing angles."  For example, the Dental

4  Monitoring app displays by video a moving arrow and progress bar ("second indicator") that

5  instruct the patient to move the phone support and connected phone in a left or right direction

6  relative to the mouth of the patient while the Cheek Retractor Tube is in position and the patient's

7  jaw is open.  (*Supra* ¶ 50.)  The smartphone captures images of the patient's teeth at specified

8  angles, indicated by the predetermined dots on the progress bar, as the patient moves the

9  smartphone in the direction(s) indicated by the moving arrow and progress bar.  (*Id.*)

10        163.    The instructions provided by the '957 Accused Products and Services comprise

11  "capturing the first and second predetermined sets of images of the teeth of the patient as the patient

12  moves the camera of the mobile telecommunications device relative to the mouth of the patient."

13  For example, the smartphone running the DentalMonitoring app captures images of the patient's

14  teeth at specified angles, indicated by the predetermined dots on the progress bar, as the patient

15  moves the smartphone in the direction indicated by the moving arrow and progress bar.  (*Supra* ¶

16  50.)

17        164.    The retractor tube positions the smartphone camera to take photographs or videos

18  of the patient's teeth when the patient has the Cheek Tractor Tube inserted in their mouth.  (*Supra*

19  ¶ 51.)   The DentalMonitoring app takes photographs or videos using the smartphone camera.

20  (*Supra* ¶ 52; Ex. 19 at 422.)

21        165.    The instructions provided by the '957 Accused Products and Services comprise

22  "displaying, during the capture of the first and second predetermined sets of images of the teeth of

23  the patient, video from the camera of the mobile telecommunications device to a screen of the

24  mobile telecommunications device."  For example, during capture of the sets of images of the

25  patient's teeth, the DentalMonitoring app running on the smartphone displays video from the

26  smartphone camera to the smartphone's display.  (*Supra* ¶ 50.)

27        166.    The instructions provided by the '957 Accused Products and Services comprise

28  "uploading the captured first and second predetermined sets of images of the teeth for treatment

1  progress evaluation to provide a treatment progress evaluation of the patient." (*Supra* ¶ 56; *see*

2  *also* Ex. 20.)

3      167.    Dental Monitoring has actively induced infringement of the '957 patent under 35

4  U.S.C. § 271(b).  Dental Monitoring possesses knowledge of and is aware of the '957 patent by

5  virtue of, at a minimum, Align's notice letter sent to Dental Monitoring's counsel on July 13, 2023

6  and the filing of these Counterclaims.  *See* Ex. 34.  Dental Monitoring induces, with specific intent,

7  infringement of the '957 patent by its customers.  Dental Monitoring encourages and facilitates

8  infringing uses of the Accused Products through the creation and dissemination of promotional and

9  marketing materials, instructional materials, product manuals, and/or technical materials to its

10  customers.

11      168.    Dental Monitoring also has been and is contributing to the infringement of one or

12  more claims of the '957 patent, either literally or under the doctrine of equivalents.

13      169.    Dental Monitoring has actively, knowingly, and intentionally contributed and

14  continues to actively, knowingly, and intentionally contribute to the infringement of the '957 patent

15  by selling or offering to sell the '957 Accused Products and Services within the United States and/or

16  by importing the '957 Accused Products and Services into the United States, with knowledge that

17  the infringing technology in the '957 Accused Products and Services is especially made and/or

18  especially adapted for use in infringement of the '957 patent.

19      170.    Dental Monitoring has contributed to the infringement by others with knowledge

20  that the infringing technologies in the '957 Accused Products and Services are material parts of the

21  patented invention, and with knowledge that the infringing technologies in the '957 Accused

22  Products and Services are not staple articles of commerce suitable for substantial non-infringing

23  use, and with knowledge that others including, but not limited to, resellers, distributors, customers,

24  dentists, orthodontists, dental and orthodontic labs, and/or other end users of the '957 Accused

25  Products and Services infringe and will continue to infringe the '957 patent because the '957

26  Accused Products and Services do not have any substantial non-infringing uses.  Dental Monitoring

27  has such knowledge at least because the claimed features of the '957 patent are used by others

28

including, but not limited to, resellers, distributors, customers, dentists, orthodontists, dental and orthodontic labs, and/or other end users of the '957 Accused Products and Services.

171.    Dental Monitoring has willfully infringed the '957 patent.  On information and belief, despite knowing that its actions constituted infringement of the '957 patent and/or despite knowing that that there was a high likelihood that its actions constituted infringement of the patent, Dental Monitoring nevertheless continued its infringing actions, and continues to make, use and sell its infringing products.

172.    Dental Monitoring's acts of infringement have injured and will continue to injure Align in a manner for which monetary damages are inadequate.

173.    Dental Monitoring's wrongful conduct has caused Align to suffer irreparable harm resulting from the loss of its lawful patent rights to exclude others from making, using, selling, offering to sell, and importing the patented inventions.  Upon information and belief, Dental Monitoring will continue these infringing acts unless enjoined by this Court.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Align hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Align respectfully prays the judgment be entered in its favor and against Dental Monitoring, as follows:

A.    A judgment in favor of Align and against Dental Monitoring on all claims in Dental Monitoring's Complaint and dismissing Dental Monitoring's Complaint with prejudice, with Dental Monitoring being awarded no relief of any kind on its Complaint, including but not limited to Dental Monitoring's request for damages and injunctive relief;

B.    A declaration that Align has not infringed, and does not infringe, any valid, enforceable, and properly construed claim of the '409, '248 patent, and '945 patents;

C.    A declaration that the claims of the '409, '248 patent, and '945 patents are invalid;

D.     A permanent injunction against Dental Monitoring and its respective officers, employees, agents, representatives, attorneys, and others acting on its behalf, from representing to anyone, either directly or indirectly, that Align has infringed, is infringing, or will infringe any claim of the '409, '248 patent, and '945 patents;

E.     A judgment that Dental Monitoring has infringed each of Asserted Align Patents;

F.     An order permanently enjoining and restraining Dental Monitoring, its officers, agents, servants, employees, and attorneys, and all others acting for, on behalf of, or in active concert with any of them, from infringing the unexpired Asserted Align Patents;

G.     An award of all damages adequate to compensate Align for Dental Monitoring's infringement of the Asserted Align Patents, such damages to be determined by a jury, and if necessary an accounting to adequately compensate Align for the infringement;

H.     An award of pre-judgment and post-judgment interest in connection with Dental Monitoring's infringement of the Asserted Align Patents at the maximum rate allowed by law;

I.     An order finding that this is an exceptional case and awarding Align its costs, expenses, disbursements, and reasonable attorneys' fees under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law, including an accounting; and

J.     Such other relief, in law or in equity, to which Align may show itself to be entitled or as this Court deems just and proper.

1    Dated:  July 14, 2023                                **PERKINS COIE LLP**

2

3                                                        By: /s/ *Hari Santhanam*
                                                            Renée E. Rothauge (SBA 271239)
4                                                           RRothauge@perkinscoie.com
                                                            PERKINS COIE LLP
5                                                           505 Howard Street, Suite 1000
                                                            San Francisco, CA 94105
6                                                           T: (415) 344-7000 / F: (415) 344-7050

7                                                           Hari Santhanam (*pro hac vice*)
                                                            HSanthanam@perkinscoie.com
8                                                           PERKINS COIE LLP
                                                            110 North Wacker Drive, Suite 3400
9                                                           Chicago, IL 60606
                                                            T: (312) 324-8400 / F: (312) 324-9400

10
                                                            John Gray (*pro hac vice*)
11                                                          JHGray@perkinscoie.com
                                                            PERKINS COIE LLP
12                                                          2901 North Central Avenue, Suite 2000
                                                            Phoenix, AZ 85012
13                                                          T: (602) 351-8000 / F: (602) 648-7000

14                                                          Sarah Fowler (SBA 264838)
                                                            SFowler@perkinscoie.com
15                                                          PERKINS COIE LLP
                                                            3150 Porter Drive
16                                                          Palo Alto, CA 94304
                                                            T: (650) 838-4300 / F: (650) 838-4350

17
                                                            Jon R. Carter (*pro hac vice*)
18                                                          JCarter@perkinscoie.com
                                                            PERKINS COIE LLP
19                                                          1155 Avenue of the Americas, 22nd Floor
                                                            New York, NY 10036
20                                                          T: (212) 262-6900 / F: (212) 977-1649

21                                                        *Attorneys for Defendant Align Technology, Inc.*

22

23

24

25

26

27

28